# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

JOHN JENSEN, ANN KARFIS,
TODD MUSTAINE, NANCY WEGRYN,
JEAN DRUCKER, JYOTHI CHAVA,          Case No.
ELIZABETH GILMOUR, DANIEL
BALOGH, TISHA VILLANUEVA, JILL       Hon.
MAISANO, JENNIFER MERIDETH,          United States District Judge
CARRON ODOKARA, GREG PENN,
MICHELE REICHENBACH, DANA            Hon.
TROMBAT, and BRENDA SCHULTZ,         United States Magistrate Judge

      Plaintiffs,

v.

FORD MOTOR COMPANY, a Delaware
Corporation,

      Defendant.

PITT, McGEHEE, PALMER, BONANNI & RIVERS P.C.
Megan A. Bonanni (P52079)
Kevin M. Carlson (P67704)
Robert W. Palmer (P31704)
Michael L. Pitt (P24429)
Beth M. Rivers (P33614)
Channing E. Robinson-Holmes (P81698)
Attorneys for Plaintiffs
117 W. Fourth Street, Suite 200
Royal Oak, Michigan 48067
(248) 398-9800
mpitt@pittlawpc.com
brivers@pittlawpc.com
mbonanni@pittlawpc.com
rpalmer@pittlawpc.com
kcarlson@pittlawpc.com
crobinson@pittlawpc.com

# COMPLAINT FOR DAMAGES AND
# EQUITABLE RELIEF AND JURY DEMAND

1.     Plaintiffs, all former salaried employees of Defendant Ford Motor Company, bring this action for wrongful discharge and civil rights violations under the Employee Retirement Income Security Act ("ERISA") and Michigan's Elliott-Larsen Civil Rights Act ("ELCRA") against their former employer, Defendant Ford Motor Company ("Ford" or "Company" or "Defendant").

2.     Ford terminated Plaintiffs' employment as part of an alleged organizational restructuring action/reduction-in-force in accordance with a uniform Company program known as the Salaried Involuntary Reduction Process ("SIRP").

3.     Through that process, Ford selected Plaintiffs for separation because of their age and for the specific purpose of preventing them from reaching important ERISA-protected Age and Service Milestones which would have allowed them to receive their full retirement pension benefits and would have dramatically increased Ford's financial obligations to their former employees who were hired before January 1, 2004.

4.     The asserted bases for Plaintiffs' terminations, including Ford's alleged reliance on one or more of the three SIRP selection criteria, are merely a pretext for discrimination because Ford has relied upon the pretext of alleged restructuring to replace Plaintiffs with younger employees, or to hire, assign, transfer, or promote younger employees into positions for which Plaintiffs were better qualified to perform.

1

5.      Further demonstrating pretext, Ford backfilled many of the positions left vacant by the alleged restructuring with younger, less senior employees who, unlike Plaintiffs, were not as close to reaching their ERISA-protected milestones for GRP pension benefits, or otherwise did not qualify for the GRP.

6.      In many instances, following Plaintiffs' terminations, Ford posted vacancies to hire new employees into positions that were left vacant because of the separation activity, and into positions that Plaintiffs were better qualified to perform, thus demonstrating that the alleged organizational restructuring was a pretext for discrimination.

7.      Following Plaintiffs' terminations, Ford assigned or transferred younger employees into positions that Plaintiffs were better qualified to perform, thus demonstrating that Ford did not engage in a bona fide reduction-in-workforce, but instead used the alleged organizational restructuring action to remove older employees[1] from the Company before they could achieve ERISA-protected Age and Service Milestones.

8.      In this action, Plaintiffs bring the following claims:

   a.  **ERISA § 510 Claims:** All Plaintiffs bring wrongful discharge claims under Section 510 of ERISA based on (1) Ford's decision to terminate their employment with the specific intent to interfere with their

---

[1] For purposes of Plaintiffs' disparate treatment claim, the term "older" is used in a relative sense. For purposes of the disparate impact claim, "older" is defined as any employee aged 50 and older.

attainment of pension benefits under the GRP, and (2) Ford's intentional discrimination against employees hired prior to January 1, 2004 who, by virtue of their hire date, would have reached ERISA age and service milestones for specific GRP pension benefits.

b. **Disparate Impact Age Discrimination Claims under ELCRA:** All Plaintiffs except Dana Trombat and Dan Balogh bring disparate impact age discrimination claims under ELCRA because the mechanisms, means, and processes by which Ford implemented the organizational restructuring action/reduction-in-force, while purportedly neutral, had an unlawful disparate impact on employees age 50 and older.

c. **Disparate Treatment Age Discrimination Claims Under ELCRA:** All Plaintiffs bring disparate treatment age discrimination claims under ELCRA because (1) they are members of the protected class, (2) they suffered an adverse employment action when Ford terminated their employment, (3) they were qualified for their positions, (4) Ford knew that the means by which it implemented the group termination would result in the disproportionate termination of older employees and thus knowingly and intentionally took actions that would result in unlawful age discrimination, (5) Ford replaced Plaintiffs with substantially younger employees and/or treated similarly situated, substantially younger employees more favorably than Plaintiffs in the process of selecting which employees would be terminated, (6) Ford singled out Plaintiffs for termination because of age; and (7) the asserted bases for why Plaintiffs were selected for separation, including the SIRP selection criteria (performance, skills, and correlation), are merely a pretext for age discrimination.

d. **Disparate Treatment Sex Discrimination Claims Under ELCRA:** Plaintiffs Jyothi Chava, Nancy Wegryn, and Jennifer Merideth bring sex discrimination claims under ELCRA because Defendant selected them for separation because of their sex, and as demonstrated by the fact that Ford replaced Plaintiffs with less qualified men, and by the fact that Ford treated similarly situated men more favorably than Plaintiffs in the process of selecting which employees would be separated.

3

e. **Race/Ethnicity/National Origin Discrimination Claim Under ELCRA:** Plaintiff Jyothi Chava brings a claim for race/ethnicity/national origin discrimination because she is Indian-American, and the only other Indian-American woman reporting to her supervisor was likewise selected for separation, while Ford retained and did not separate the four Caucasian men at the LL5 level reporting to their supervisor.

f. **Claims under the Family and Medical Leave Act ("FMLA"):** Plaintiffs Brenda Schultz and Jean Drucker bring FMLA claims against Defendant because Defendant willfully violated the FMLA by terminating Plaintiff Schultz's employment for requesting and/or taking FMLA leave, and Defendant willfully violated the FMLA by terminating Plaintiff Drucker's employment for the purpose of interfering with her need for impending leave under the FMLA.

## PARTIES, JURISDICTION, AND VENUE

9.    Plaintiff John Jensen is resident of Wayne County, Michigan.

10.   Plaintiff Ann Karfis is a resident of Oakland County, Michigan.

11.   Plaintiff Tisha Villanueva is a resident of Washtenaw County, Michigan.

12.   Plaintiff Jyothi Chava is a resident of Oakland County, Michigan.

13.   Plaintiff Dana Trombat is a resident of Oakland County, Michigan.

14.   Plaintiff Daniel Balogh is a resident of Lee County, Florida.

15.   Plaintiff Todd Mustaine is a resident of Wayne County, Michigan.

16.   Plaintiff Jean Drucker is a resident of Wayne County, Michigan.

17.   Plaintiff Elizabeth Gilmour is a resident of Wayne County, Michigan.

4

18.     Plaintiff Jill Maisano is a resident of Wayne County, Michigan.

19.     Plaintiff Greg Penn is a resident of Lake County, Indiana.

20.     Plaintiff Carron Odokara is a resident of Wayne County, Michigan.

21.     Plaintiff Nancy Wegryn is a resident of Manatee County, Florida.

22.     Plaintiff Jennifer Merideth is a resident of Wayne County, Michigan.

23.     Plaintiff Michele Reichenbach is a resident of Oakland County, Michigan.

24.     Plaintiff Brenda Schultz is a resident of Oakland County, Michigan.

25.     Defendant Ford Motor Company is a Delaware Corporation that is headquartered and established in Wayne County, Michigan.

26.     All the events in controversy occurred in Wayne County, Michigan.

27.     Pursuant to 28 U.S.C. § 1331, this Court has subject matter jurisdiction over this matter because Plaintiffs' ERISA claims (brought under 29 U.S.C. § 1140) and FMLA claims (brought under 29 U.S.C. §2601, *et seq.*) arise under federal law.

28.     Pursuant to 28 U.S.C. § 1367, this Court should exercise supplemental jurisdiction over Plaintiffs' state law claims because those claims arise out of the same set of operative facts as Plaintiffs' federal claims, such that all claims form part of the same case and controversy.

29.     Pursuant to 28 U.S.C. § 1391, venue is established in this District Court because Defendant is headquartered in the Eastern District of Michigan and the

events giving rise to the lawsuit occurred in the Eastern District of Michigan.

## GENERAL ALLEGATIONS

**A.    Ford was motivated to target Plaintiffs for termination to prevent them from achieving ERISA-protected Age and Service Milestones, based on the Company's desire to alleviate the financial burden of legacy costs attributable to its traditional defined benefit pension plan.**

30.     Ford's General Retirement Plan ("GRP") was formed in 1950.

31.     The GRP is a traditional, defined benefit pension plan that pays fixed monthly or lump sum retirement pension amounts to eligible Ford employees.

32.     The GRP provides a variety of pension benefits, including regular and early retirement pensions and certain supplemental pension allowances.

33.     As of December 31, 2017, the GRP had assets of $19,697,120,747; active/eligible participants totaling 16,381 people; retired or separated participants receiving benefits totaling 32,850 people; and retired or separated participants eligible to receive future benefits totaling 14,642 people.

34.     Since the early part of the 2000s, Ford has taken steps to remove from its balance sheet pension obligations that the Company, along with consultants and investors, viewed as debts weighing down its credit rating and stock price.

35.     Since the early 2000s, the Company's pension obligations to current and future retirees exceeded the assets of the GRP.  Ford has taken steps to remove from its balance sheet underfunded pension obligations that the Company, along with

consultants and investors, viewed as debts weighing down its credit rating and stock price.

36.    The underfunding of the GRP has been a persistent problem continuing to the present time. This unresolved problem continues to be a source of frustration for Ford management.

37.    Although the Company has over time infused the GRP with cash to eliminate the Plan underfunding, targeting Plan participants for elimination from the Company and the GRP has been a part of the corporate strategy since late 2003.

38.    In 2003, Ford announced that beginning January 1, 2004, the GRP would be closed to new hires and rehires.

39.    According to Ford's ERISA Plan Year 2009 Form 5500, as of December 31, 2009, the GRP had assets of $18,859,715,454; active/eligible participants totaling 24,512 people or separated participants receiving benefits totaling 51,829 people; and retired or separated participants eligible to receive future benefits totaling 31,841 people.

40.    According to Forbes, Ford's global pension plans went from being $19 billion underfunded at the end of 2012 to $9.8 billion at the end of 2014.

41.    According to Ford's ERISA Plan Year 2017 Form 5500, as of December 31, 2017, the GRP had assets of $19,697,120,747; active/eligible participants totaling 16,381 people; separated participants receiving benefits totaling

32,850 people; and retired or separated participants eligible to receive future benefits totaling 14,642 people.

42.   According to Ford's ERISA Plan Year 2021 Form 5500, as of December 31, 2021, the GRP had assets of $21,860,238,492; active/eligible participants at beginning of Plan year at 13,426 and 11,760 by the end of Plan Year 2021; separated participants receiving benefits totaling 29,640 and separated participants eligible for future benefits totaling 10,500.

43.   In 2012, the Company, to further reduce its pension obligations (also known as "de-risking" its obligations), amended the GRP to provide that retiring participants would now have the option to secure a lump sum payment in lieu of the annuity which provided lifetime monthly benefits to the retiree and his surviving spouse.

44.   Ford promoted the lump sum payout option because that was a way for Ford to effectively de-risk its pension obligations by shifting the risk of an underfunded pension from the Company to the employee.

45.   As a result of this de-risking program, Ford was able to reduce its underfunded pension obligations from $19 billion in 2012 to $9.8 billion on December 31, 2014.

46.     According to Ford's 8-K Form filed with the Securities and Exchange Commission on January 22, 2020, the Company reported that, in the year 2019, the GRP was underfunded by about $6.8 billion.

47.     The Company reported that, in 2018, the GRP was underfunded by $6.3 billion.

48.     Under the amended GRP, salaried employees hired before January 1, 2004 with 30 years of Company service can retire and receive an unreduced lifetime monthly benefit with spousal survivor option, or they can elect to take a lump sum payout at retirement.

49.     The GRP includes specific ERISA Age and Service Milestones. Specifically, Ford salaried employees such as Plaintiffs, hired before January 1, 2004, and who retire at age 55 years old or greater, with 10 years or more years of service, receive an unreduced monthly benefit with spousal survivor options upon retirement, or may elect to take a lump sum payout. This "55 and 10" retirement is also known as a "normal early retirement" under the GRP.

50.     Employees who at the time of retirement have 10 years or more of Company service but less than 30 years Company service or who are under age 55 with less than 30 years of service will receive a substantially reduced pension.

51.     A Retiree Health Care insurance subsidy is also available to Company employees hired before June 1, 2001, and who retire under the GRP at age 55 or

9

greater with 10 years or more of service or at any age with 30 or more years of Ford Service.

**B.    Ford terminated Plaintiffs employment for the specific purpose of interfering with their attainment of ERISA-protected Age and Service Milestones.**

52.    Plaintiffs are all former long-term salaried employees of Ford who were hired before January 1, 2004 and were selected for separation because of their age and for the specific purpose of preventing them from reaching important milestones which would have allowed them to receive their full retirement pension benefits and would have dramatically increased Ford's financial obligations to their former employees.

53.    Ford salaried employees, such as Plaintiffs, hired before January 1, 2004, were participants in Ford's General Retirement Plan ("GRP").

54.    Thus, but for the termination of their employment, Plaintiffs would have attained the ERISA-protected Age and Service Milestones under the GRP, specifically:(1)   "55 and 10" normal early retirement, under which they would receive a full retirement at age 55 with ten years of service;  and (2) the "30 and Out" pension supplement, under which employees with at least 30 years of credited service who take early retirement receive an additional monthly pension payment until the age of 62 (hereinafter referred to as the "Age and Service Milestones).

55.    Ford, through the mechanisms, means, processes, and criteria used to

implement its organizational restructuring action/reduction-in-force, terminated Plaintiffs based on their age, for the purpose of preventing them from attaining their ERISA-protected Age and Pension Milestones, namely the "30 and Out" supplemental benefit, or the "55 and 10" early retirement benefit, or both.

56.    By terminating its salaried employees to prevent them from achieving one or both Milestones, Ford significantly reduced the employees' lifetime retirement benefits and significantly improved its balance sheet by reducing its ongoing pension, retiree healthcare and other post-employment benefit obligations.

57.    For each Plaintiff, the impact of being terminated short of their ERISA-protected Age and Service Milestones is financially devasting, with each Plaintiff losing hundreds of thousands of dollars in lifetime pension benefits, along with retiree medical benefits, because of Ford's decision to terminate them before they could reach the critical GRP pension milestones.

58.    Statistical evidence will be probative of intentional discrimination and interference in violation of ERISA Section 510 in at least two ways: (1) the selection rate for employees hired before January 1, 2004 versus the selection rate for employees hired after 1/1/04, will be heavily weighted against employees hired before 2004, and therefore eligible for GRP, and will thus be probative of the intent to terminate employees hired before January 1, 2004; and (2) as to employees hired after January 1, 2004, who were participants in the GRP, the selection rate for

employees approaching their Age and Service Milestones will be disproportionately higher, and this disparity is probative of intentional discrimination to select employees to prevent them from achieving ERISA-protected Age and Service Milestones.

59.     A comparison of the percentage of salaried employees who were eligible for and approaching the ERISA-protected Age and Service Milestones, who were selected for separation, to the percentage of salaried employees who were not eligible for and approaching those Milestones within the Company as a whole, will prove the Company's specific intent to select employees for separation for the purpose of depriving them of ERISA-protected benefits, that is, to engage in prohibited interference with Plaintiffs' attainment of the Age and Pension Milestones in violation of ERISA Section 510.

60.     A comparison of the percentage of salaried employees who were hired before January 1, 2004, and were therefore approaching ERISA-protected Age and Service Milestones, who were selected for termination, to the percentage of employees who were hired before January 1, 2004 within the Company as a whole, will be probative of the Company's specific intent to discriminate against employees who were hired before January 1, 2004 based on their ERISA-protected status under the terms of the GRP.

12

**C. Ford terminated Plaintiffs because of age**

    **1. The means by which Ford selected employees for termination, while allegedly age neutral, had an unlawful disparate impact on employees age 50 and older.**

61.    Age was an additional motivating reason for Plaintiffs' terminations. By design, as part of the SIRP, Ford selected for termination older employees who had not yet reached the GRP's Age Milestone.

62.    Ford terminated Plaintiffs' employment as part of a uniform, Company-wide organizational restructuring action/reduction-in-force program known as the Salaried Involuntary Reduction Program ("SIRP").

63.    The SIRP is a separation program under which Ford purportedly selects employees for termination based on one or more of the following three criteria: (1) "the employee's performance;" (2) "the employee's skill level and breadth of skills;" and (3) "the correlation between the employee's skill level and breadth of skill and the work that is necessary for the Company to perform to achieve its objectives" (Ford calls the third criteria "skills needed for the future," or "future skills.").

64.    The process of notifying Plaintiffs of their separations began on August 22, 2022, with the earliest effective date of termination being August 31, 2022.

65.    Plaintiff Brenda Schultz was on an approved medical leave when the SIRP terminations began in August 2022. She returned to work on October 18, 2022, and was informed of her termination that day. The effective date of Schultz's

13

separation was October 31, 2022.

66.   In the official notification informing Plaintiffs of their terminations, Ford stated: "You are within the decisional unit identified above that management has made part of an organizational restructuring action. As part of this organizational restructuring process, you have been informed that your employment is to be terminated under the Salaried Involuntary Reduction Process ("SIRP")."

67.   Ford's notification further described the "selection criteria for employees who are being terminated under SIRP in your decisional unit" as follows:

> **Selection Criteria:** Employees in the unit are selected for separation in accordance with SIRP. SIRP applies to salaried active full-time and Transitional Work Arrangement U.S. employees who are within the decisional unit. All employees within the decisional unit are evaluated for possible separation based on an assessment of one or more of the following factors: the employee's performance; the employee's skill level and breadth of skills; and the correlation between the employee's skill level and breadth of skill and the work that is necessary for the Company to perform to achieve its objectives.

68.   The specific, purportedly age-neutral employment practices used by Ford to select which employees would be terminated caused significant statistical disparities based on age because:

a. Absent explanation, one would ordinarily expect the percentage of employees over 50 selected for termination to be approximately the same as the percentage of employees over 50 within the Company as a whole.

14

b.  Plaintiffs allege that Ford's specific employment practices caused a significant statistical disparity based on age because the actual number of employees over 50 who were selected will be more than 2 standard deviations from the expected outcome for employees over 50 in an age-neutral program. *See Hazelwood Sch. Dist. v. United States*, 433 U.S. 299, 309, n. 14 (1997) (quoting *Castaneda v. Partida*, 430 U.S. 482, 496-497, n. 17 (1977) ("(a)s a general rule for such large samples, if the difference between the expected value and the observed number is greater than two or three standard deviations,' then the hypothesis that teachers were hired without regard to race would be suspect.")

c.  Thus, Plaintiffs allege that the employment practices used to select salaried employees for termination disproportionately affected employees aged 50 and older to such an extent that it is probative of age discrimination.

69.  In this action, Plaintiffs challenge the specific, purportedly age-neutral mechanisms, means, criteria, and practices by which Ford selected employees for termination in the course of implementing its organizational restructuring action/reduction-in-force, which caused significant statistical disparities based on age, including the following employment practices:

a.  Designing and programming its reduction-in-force/organizational

15

restructuring process to target older and higher pension-cost salaried employees based on legally protected characteristics including the employee's proximity to retirement benefit milestones or the employee's age.

b. Targeting demographically disproportionate departments for separations, thus increasing the likelihood of selecting employees over the age of 50.

c. Defendant's use of the stated SIRP criteria, including: "the employee's performance; the employee's skill level and breadth of skills; and the correlation between the employee's skill level and breadth of skill and the work that is necessary for the Company to perform to achieve its objectives."

d. Defendant's practice of allowing decision makers to make putatively individualized, discretionary and subjective choices of which jobs to eliminate and/or which employees to select for separation.

e. Placing the decision-making process in the hands of multiple decision makers without uniform criteria or standardized guidance when making those decisions.

f. Traditionally, Ford has used forced ranking performance evaluation processes and other ranking and rating methods that had been shown to

16

be biased against its older employees, and, upon information and belief, Ford used those same or similar forced ranking and other ranking and rating methods in the course of implementing the 2022 SIRP reduction-in-force despite knowing that they were prone to age bias.

70.   The foregoing specific employment practices are responsible for significant statistical disparities based on age and were the cause in fact of the selection of Plaintiffs for separation.

71.   These specific employment practices lack structured and objective criteria, and the specific employment practices are, by design, infused with undisciplined and subjective decision making to determine how organizations would be restructured and which employees would be selected for termination.

72.   The specific employment practices challenged in this lawsuit all include subjective criteria, such as the determination of the employees' performance, skills/breadth of skills, and "correlation," which Ford commonly refers to as "future skills," or "skills for the future."

73.   These subjective criteria, either alone or in combination with objective factors, are an integral part of the specific employment practice utilized by Ford to select employees for separation, which caused disparities in the selection process based on age.

74.   The specific employment practices utilized by Ford to select employees

for separation allowed unintentional stereotypes or prejudices about age to affect decisionmakers' selection of which employees would be separated.

75.     The foregoing mechanisms, means, criteria, and practices by which Ford implemented its organizational restructuring action/reduction-in-force made Plaintiffs more vulnerable to separation because of their age.

76.     These mechanisms, means, criteria, and practices were uniform and Company-wide, and thus the statistical disparities based on age must be determined based on a comparison between the jobs and persons selected for termination and the Company as a whole.

77.     Ford's use of these mechanisms, means, criteria, and practices did in fact result in disproportionate terminations of older employees, including plaintiffs, and therefore harmed older employees substantially more than younger employees.

**2.     Ford intentionally discriminated against Plaintiffs because of age.**

**a.  Ford knew that the practices used to select employees for separation would disproportionately harm older employees.**

78.     In prior group terminations under the SIRP criteria, the practices by which Ford selects employees for separation have been proven, through statistical evidence and otherwise, to discriminate against older employees by disproportionally selecting older employees for termination because of their age.

79.     For example, the 2019 SIRP terminations resulted in statistically significant disparities based on age, and Ford's highest-level executives and

members of Ford's Board of Directors specifically requested that the termination program be used to "identify and elevate junior talent in the organization" and to pull up younger personnel from the Company's "pipeline" to replace the older employees who were selected for termination in the SIRP.

80.    Thus, when Ford terminated Plaintiffs' employment, it knew that the practices used to select employees for termination would result in the disproportionate termination of older employees.

81.    When Ford implemented the alleged organizational restructuring action in 2022, it had enough information to know that the practices used to select employees for termination would disproportionately select older employees for termination.

82.    Despite knowing that its actions would result in the targeting and disproportionate termination of older employees, Ford did not take any actions in 2022 to correct or lessen the impact that its methods would have on those employees, and thus knowingly and intentionally took actions that it knew would result in unlawful age discrimination in carrying out the 2022 separation program.

83.    In other words, Ford knew that its 2022 process would result in discrimination against older employees and implemented the 2022 process anyway, thus demonstrating that it intended for the process to result in discrimination against older employees in 2022.

19

**b. Ford took additional actions to ensure that older employees who were hired before January 1, 2004 and were approaching their ERISA Age and Service Milestones would be terminated without a fair opportunity to continue their careers with Ford, thus demonstrating the intent to discriminate because of age and for the purpose of preventing employees from achieving ERISA-protected Age and Service Milestones.**

84.     In the process of implementing the group termination action, Ford also refused to allow salaried employees terminated in the SIRP, including Plaintiffs, to transfer to open positions, or to relocate to maintain their employment, and it has refused to permit the targeted employees, including Plaintiffs, from taking lower positions for which they were fully qualified and would have allowed them to continue their employment and reach their pension milestones.

85.     By contrast, Ford did not select for termination employees who were substantially younger than Plaintiffs, and further is assigning, transferring, promoting, or hiring younger employees into positions to replace Plaintiffs upon separation.

86.     In some instances, Ford retained and did not select for termination employees who were closer in age to Plaintiffs, but who were not eligible for "55 and 10" or "30 and out" GRP benefits, or employees who had already reached their milestones, and could therefore be retained without accruing service credits towards the same defined pension benefits as Plaintiff would have, but-for their terminations.

87.     Ford continues to advertise for new employees to be hired into positions

that could easily be handled by the targeted employees.

88.     The SIRP termination program under which Ford terminated Plaintiffs' employment was not a true and bona fide reduction-in-force because Ford has openly hired and posted for the hiring of new, substantially younger employees in positions that Plaintiffs, based on their knowledge, experience, prior performance, and skill sets, were better qualified to perform.

89.     The legal standards and rules for analyzing employment decisions in the context of a reduction-in-force do not apply in this case because Ford did not engage in a bona fide reduction-in-force activity.

### c. Ford encouraged both conscious and unconscious age bias in the decision-making process.

90.     It is well-known that age stereotypes often infect a decision-making process, whether consciously or subconsciously, and that sometimes even well-intentioned decision makers unknowingly act on ageist biases, assumptions, or attitudes, as well as conscious or unconscious stereotypes about the performance, skills, abilities, or traits of older employees.[2]

91.     Like all companies, Ford is affected by conscious age bias as well as implicit, or unconscious age bias.

---

[2] For example, see: *Overcoming Unconscious Age Bias: An Expert's Advice*, available at https://www.forbes.com/sites/nextavenue/2021/12/03/overcoming-unconscious-age-bias-an-experts-advice/?sh=70875e552bcc (page last accessed February 15, 2023)

92.     In this case, the policies and procedures used by Ford to carry out the restructuring action did not take into account the impact of age bias, either conscious or unconscious, which Ford knew would result in the disproportionate selection of older employees for termination.

93.     In fact, instead of discouraging the influence of conscious and unconscious age bias, Ford encouraged age bias in the process of selecting which employees would be selected for termination.

94.     For example, the messaging from Ford's leadership surrounding the need for organizational change, as well as how it would be achieved, directly fostered ageist stereotypes about older employees, including how when it comes to modernizing or adapting to new technologies, younger people have better and more valuable skills than older people.

95.     In early 2022, prior to Plaintiffs' terminations under the SIRP, Ford's CEO Jim Farley ("Farley") stated publicly that the Company would be making organizational changes and employee separations.

96.     In these statements, Farley used explicitly ageist as well as language which reveals an intention on the part of Ford to select older employees for separation based on their age.

97.    Farley expressly compared the state of the Company today to the state of the Company when his grandfather worked for Ford, saying, "My grandfather worked at the Rouge plant and those jobs are going to change."

98.    Farley also described needed organizational changes as requiring "totally different talent" because "We don't have that talent at Ford."

99.    Farley's comments reflect a bias against older incumbent employees based on the ageist assumptions that they are less useful than new talent, that they cannot develop new skills, cannot adapt their demonstrated skill sets to new requirements, and would be too slow in learning, developing or adapting skills to the needs of the Company.

100.   Farley's comments, and other messaging of a similar nature, signaled to decision-makers that it is okay to discriminate against older employees to serve Ford's overall objective of staying competitive in the evolving and modernizing automotive industry.

101.   Ford's organizational restructuring action/reduction-in-force, and the selection of Plaintiffs for termination, is also rooted in ageist assumptions that older employees don't have enough value to the Company because their prior work involved internal combustion engines, and that they are not as valuable to the Company as it develops technology using digital features, new battery technology, and other electronics, and/or that Plaintiffs and other older employees will likely

retire in the relative short-term and therefore will not provide sufficient future value to Ford.

102.   Ford's systemic bias against older employees is further reflected in the substance of the SIRP selection criteria, which were used to select which employees would be terminate.

103.   The three SIRP criteria are part of a uniform, centralized, and Company-wide program which directs and guides decision-making for salaried employee terminations, including Plaintiffs' terminations, and requires the use of common decision-making tools and criteria for selecting employees for separation.

104.   Each of the SIRP criteria, individually or combined, directs decision-makers to discriminate because of age.

105.   The "performance," "skills," and "correlation" / "skills for the future" criteria direct decision-makers to engage in undisciplined and purely subjective and biased decision-making about the quality of employees' performance, the nature and breadth of employees' skills, and what their future contribution to the Company might be, to the inherent disadvantage of older personnel.

106.   In addition, by requiring decision-makers to consider "skills for the future," the SIRP directs separation decisions on age-biased factors that are entirely subjective, including assumptions that younger employees will be more likely to have the skills needed for Ford's future objectives, and assumptions that older

employees will be less likely to adapt their skills to future needs, and that older employees will be slower to learn new skills, programs, and processes.

107.    The SIRP criteria also are not based on objective or quantitative metrics or criteria but are instead dependent on the highly subjective and discretionary impressions of decision-makers, and the implementation of the SIRP is therefore prone to discriminatory bias because it lacks structured, objective criteria to minimize the influence of conscious and unconscious age bias.

108.    As part of its subjective decision-making criteria, Ford utilizes a forced-ranking process known as the 25-panel process to formulate performance ratings, despite knowing that the 25-panel has been proven to be an age-biased method for rating employee performance.

> **d. The facts demonstrate that the asserted bases for Plaintiffs' separations are merely a pretext for age discrimination as well as discrimination and interference to deprive Plaintiffs of ERISA-protected benefits.**

109.    The facts of this case demonstrate that the asserted bases for Plaintiffs' terminations, including Ford's articulated reliance on one or more of the three SIRP criteria (performance, skills, and correlation) are merely a pretext for discrimination because Ford has relied upon the pretext of restructuring to replace Plaintiffs with younger employees, or to clear paths for younger employees either to transfer, be hired for, or to move into positions for which Plaintiffs were better qualified to perform.

110. Furthermore, the articulated bases for selecting Plaintiffs for termination (performance, skills/breadth of skills, and correlation) are demonstrably pretextual because if the SIRP criteria had been applied faithfully, rather than as a vehicle for age discrimination and interference with pension benefits, then Plaintiffs would not have been terminated. This is because:

a.  Plaintiffs were all long-term employees with strong performance records, and there was therefore no factual basis for selecting them for termination based on their prior performance.

b.  Plaintiffs all demonstrated the depth and breadth of skills needed to perform valuable jobs for the Company, thus demonstrating that there was no basis for terminating them under the "skills" criteria of the SIRP.

c.  Plaintiffs demonstrated their ability to perform skills that correlated directly with the Company's business needs and, other than age-biased decision-making, there is no basis for concluding that Plaintiffs lacked "skills for the future" in comparison with the substantially younger employees who were either retained or hired to fill positions that Plaintiffs were better capable, through their skills and experiences, to perform.

e. **The facts surrounding Plaintiffs' terminations demonstrate that they were terminated because of age and for the purpose of interfering with their attainment of ERISA Age and Service milestones.**

## PLAINTIFF JOHN JENSEN

**Disparate Treatment Age Discrimination Claim, Disparate Impact Age Discrimination Claim, and ERISA Discrimination and Interference Claims under 29 U.S.C. § 1140 (Section 510)**

111. Plaintiff John Jensen ("Jensen"), age 53 at the time of termination, began his employment with Defendant Ford Motor Company on July 3, 1995 and had 27.08 years of credited service under the GRP at the time of termination.

112. Defendant terminated Jensen's employment effective August 31, 2022, under the SIRP.

113. Thus, at the time of termination from employment, Jensen was 53 years old and was only 16 months away from his milestone for a 55 and 10 normal early retirement under the GRP, and 2 years, 11 months away from his 30-year retirement milestone under the GRP.

114. Jensen earned a Bachelor of Science degree in mechanical engineering and a Master of Science in mechanical engineering from the University of Michigan-Dearborn.

115. At the time the time of termination, Jensen was in the salary grade 8 (SG8 or GSR 8) position of Advanced Driver Assisted Systems (ADAS) Design and

Release Application Engineer, within the group known as ADAS Driver Assisted Technology (DAT) Features System Hardware.

116.   Jensen joined the ADAS (Driver Assisted Technology) DAT Features System Hardware group on or about November 1, 2021, reporting to Marcus McKinney (LL6).

117.   At that time, McKinney supervised one group of employees, which handled three areas of product content - Park Aid, Cameras, and Radar.

118.   Jensen was assigned to work as an ADAS design and release application engineer for Park Aid content.

119.   When Jensen arrived in November 2021, the other SG8 engineers with responsibilities in Park Aid were Sue Ehlert, Daniel Feutz, and Manoj Kalyankar.

120.   In late February and early March of 2022, the ADAS Group began an organizational expansion, with additional people assigned to the group, including 23 new salaried non-management (aka SG or GSR) employees and 4 new supervisors (aka LL6 and above personnel).

121.   The sub-group in which Jensen worked, which handled Park Aid, was subdivided into three groups, with addition of nine new GSR employees and two new supervisors.

122.   As part of this organizational expansion, Noah Cavitt, an LL6, took over as Jensen's supervisor, while McKinney retained supervisory responsibilities over the design and release application engineers working on camera content.

123.   In July 2022, two SG8 employees – Allan Fisher and Nikhelesh Podduturi – joined the ADAS group as ADAS design and release application engineers.

124.   Fisher and Podduturi were transferred from other organizations in Ford to join the ADAS group.

125.   In August 2022, Ford hired a new employee named Osama Masri, approximately age 32, as an ADAS DAT design and release application engineer.

126.   Jensen then prepared training for Masri in how to handle Jensen's duties and responsibilities.

127.   At the time of termination, Jensen reported to Noah Cavitt (LL6), who in turn reported to Mohsen Katiba (LL5).

128.   At the time of separation, Jensen was responsible for park aid content across four products – 758 (Maverick), 430 (small Bronco), 483 (Corsair), and 725 (large Bronco).

129.   After Ford terminated Jensen's employment, it assigned his responsibilities to substantially younger employees Osama Masri (Maverick, small Bronco, and Corsair), and Manoj Kalyankar (Maverick and large Bronco).

130.   Jensen was the only SG8 selected for separation in this group while the other SG8s – Allan Fisher, Sue Ehlert, Manoj Kalyankar, Podduturi, Masri, and Feutz – were retained, and continued reporting to Cavitt and Katiba.

131.   Furthermore, Ford posted new openings for ADAS design and release application engineer positions before, during, and after terminating Jensen's termination from employment, thus demonstrating that Ford had a continuing need of Jensen's skills and services when it terminated him and retained and hired substantially younger employees in positions that Jensen was better qualified to perform.

132.   Thus, Ford did not eliminate Jensen's position or engage in a true reduction-in-force as to Jensen's position.

133.   Ford treated similarly situated and substantially younger employees more favorably than Jensen in the process of separating personnel under the SIRP.

134.  Ford replaced Jensen with less experienced and less qualified individuals who were not close to achieving ERISA-protected Age and Service Milestones.

## PLAINTIFF ANN KARFIS

### Disparate Treatment Age Discrimination Claim, Disparate Impact Age Discrimination Claim, and ERISA Discrimination and Interference Claims under 29 U.S.C. § 1140 (Section 510)

135.   Plaintiff Ann Karfis ("Karfis"), age 52 at the time of termination, began her employment with Ford on March 10, 1997, and thus had 25.6 years of credited service in the GRP at the time of termination.

136.   Defendant terminated Karfis' employment effective August 31, 2022, as part of the SIRP.

137.   At the time of her termination, Karfis was 52 years old and had 25.6 years of credited service with Ford and was therefore 26 months short of reaching the milestone for a normal early retirement (55 and 10) and 4.4 years short of reaching her 30-and-out retirement milestone under the GRP.

138.   Karfis received a Bachelor of Arts degree in materials and logistics management (aka supply chain) from Michigan State University College of Business, with a concentration in purchasing and operations.

139.   Karfis received an MBA, with a focus in finance, from Wayne State University in 1997.

140.   Over the course of her 25+ year career with Ford, Karfis demonstrated strong performance and a broad skill set, as demonstrated by her work in the following positions:

31

    a.  Logistics Engineer/Truckload buyer, 1997.

    b.  Buyer, 1998.

    c.  Buyer, 1999-2000.

    d.  Global Specialist, 2001-2002

    e.  Purchasing Specialist, 2003 – 2016.

    f.  Purchasing Manager, 2017-December 2019.

    g.  iERP Specialist, December 2019/early 2020-2022.

141.   At the time of separation, Karfis held the position of iERP specialist, salary grade LL6.

142.   In her year-end Performance Review for 2020, Karfis received an overall rating of Achiever, with the following comments from her people leader, Robert McKee Jr.:

> Ann has done a good job navigating the waters of Supplier Enablement to establish wave planning for Canada. Ann works very well and collaboratively with others, both within the I-ERP team (for example, with IT and SLP PDO team) and outside the team (PIMS and SAP Ariba). She chairs a weekly meeting to drive discussion, decisions and next steps for Supplier Enablement of direct, FCSD unique, and Pay only suppliers for Canada. Ann also co-lead 4 supplier summits in 2020 with SAP Ariba, introducing Wave 1 and Wave 2suppliers to the Supplier Enablement process with Ford. Next year will be a critical year in this space and we will look to Ann to lead the way, to establish Canada payable suppliers Enterprise accounts on the Ariba Network, and also work closely with the Deployment team for additional wave planning for the rest of the North American deployment (US/MEX )that will deploy in 2022. Ann will also

need to continue close coordination with the SLPPDO team to provide a seamless process flow to register and qualify suppliers in SLP and to establish suppliers Enablement on the Ariba Network.

143.  In her year-end Performance Review for 2021, Karfis received an

overall rating of Achiever, with the following comments from her people leader,

Mary Proch:

Ann had a strong 2021 within the SRM Team. The Canadian Supplier Enablement work stream was well designed an executed prior to our Canadian Launch in May. However, with no fault to the team, the enablement work stream came with many surprises. At every point Ann pivoted with the team, providing support in "go-fast" activities to protect launch as well as Option C which turned our enablement/on boarding strategy for a different course mid-year.

Additionally, Ann's commitment and leadership amongst the team shines as she trained and onboarded new team members and summer interns, as well as her constant commitment to share knowledge within the SRM space.

I challenge Ann to focus on "Create Tomorrow", as there is significant opportunity to refine and move towards implementation of the SLP Onboarding strategy early next year. But encourage Ann to continue to "Do The Right Thing" for our suppliers (and their experience in I-ERP) and SRM teammates.

The I-ERP Team appreciates Ann's contributions and I look forward to working with Ann in the SLP Onboarding space as we march towards the largest deployment milestone of the I-ERP project in 2022.

144.   Sandy Seremak became Karfis's direct supervisor in approximately June 2022.

145.   At the time of her selection for separation under the SIRP, Karfis reported directly to Seremak (salary grade LL6), who in turn reported to John Northcott (LL4 or LL3).

146.   On August 22, 2022, Northcott informed Karfis that she had been selected for separation under the SIRP and that the reason for her separation was her "breadth of skills."

147.   The stated reason for Karfis's selection for separation is false, as proven by her demonstrably broad skill set in purchasing over her 25+ years of employment with Ford.

148.   Shortly after Karfis was terminated, Ford replaced her with a substantially younger employee, Lindsay Weaver, approximately age 41, who is now performing the duties and responsibilities that Karfis performed prior to termination.

149.   Ford hired Weaver after January 1, 2004, and Weaver is therefore not eligible for any defined benefit pension under the GRP.

150.   In addition to hiring new employees to perform jobs that Karfis was better qualified to perform, Ford also promoted substantially younger and less senior employees to perform jobs that Karfis was better qualified to perform.

151.   Thus, Ford had a continuing need of Karfis's skills and services when it terminated her and retained substantially younger employees in positions that Karfis was better qualified to perform.

152.   Ford did not eliminate Karfis's position or engage in a true reduction-in-force as to her position.

153.   Ford treated similarly situated and substantially younger employees more favorably than Karfis in the process of separating personnel under the SIRP.

154.   Ford replaced Karfis with less experienced and less qualified individuals who were not eligible and were not close to achieving ERISA-protected Age and Service Milestones and pension benefits.

155.   At the time of termination, Ford provided Karfis with a disclosure pursuant to the Older Workers Benefits Protection Act (OWBPA) purporting to show the ages and job titles of persons selected and not selected for separation under the SIRP.

156.   This OWBPA form is not accurate because Karfis was the only LL6 employee reporting to Seremak, and there is no way to discern why the employees identified in the form are included in the decisional unit for LL6 Purchasing Specialists.

**PLAINTIFF TISHA VILLANUEVA**

**Disparate Treatment Age Discrimination Claim, Disparate Impact Age Discrimination Claim, and ERISA Discrimination and Interference Claims under 29 U.S.C. § 1140 (Section 510)**

157.   Plaintiff Tisha Villanueva ("Villanueva"), age 50 at the time of termination, began her employment with Ford on August 28, 1995, and thus had 26.9 years of credited service in the GRP at the time of termination.

158.   Ford notified Villanueva of her separation on August 22, 2022, and terminated her employment effective August 31, 2022, under the SIRP.

159.   Villanueva has a Bachelor of Science Degree in Mechanical Engineering as well as a master's degree in mechanical engineering, both from the University of Illinois at Urbana-Champaign.

160.   At the time of the termination of her employment, Villanueva was 50 years old with 26.9 years of credited service under the GRP and was therefore 5.1 years away from reaching her normal early retirement (55 and 10) milestone and 3.1 years away from reaching her 30 and out retirement milestone under the GRP.

161.   Villanueva's most recent position at Ford was Power Train Program Management Team (PMT) Leader, at salary grade LL6.

162.   In that position, Villanueva reported to Patrick Torossian (LL4), who in turn reported to Cynthia Flanigan (LL3), Chief - Systems and Hardware

Integration, who in turn reported to Paul Randle, Director of Module Integration & Quality (MI&Q).

163.   Villanueva worked in the same organization, Powertrain Integration Management (now known as Systems and Hardware Integration), from 2006 until the date of her separation.

164.   Villanueva took the position of PMT Leader (LL6) in September 2014.

165.   Torosian became Villanueva's direct manager in 2016.

166.   Villanueva was a consistently strong performer.

167.   In her year-end performance review for 2020, Villanueva was rated Achiever, and her supervisor, Torosian, provided the following comments in support of her review:

> Tisha is open and honest contributor to the T6 team and an effective and hard working individual who always seem to have time to support issue resolution. I particularly enjoyed working with her through the vehicle count exercise and I found her judgement to be sound and well balanced.    well and communicates clearly and is a valuable asset to the company. From outside of her department, it seems as if she empowers her team and does not micro manage, but is supportive where required.

168.   In her year-end performance review for 2021, Villanueva was rated Top Achiever, the rating reserved for the top fifteen percent of employees.

169.   In his comments supporting Villanueva's 2021 Performance Rating, Torosian wrote:

Tisha is very knowledgeable in Powertrain integration deliverables. She has taken likely the most complex program in the company and done a lot to ensure accuracy of the BOM and designs throughout the year.

She has also kept the functional areas in check and informed. This is not easy considering they have up to 2 milestones/week and most are for Tisha's program.

She has successfully delivered multiple milestones through out the year, 5 PEC/FECs and delivered TT for FTM assembly plant.

I always appreciate Tisha's perspective and outlook on complexity and organizational approach.

She should help the team learn what it takes to deliver programs by teaching her colleagues and their team.

Also, Tisha should be potentially picking up another major program in 2022CY (potentially the MCA program)

170.   Prior to her termination in the SIRP, Villanueva was one of four LL6

PMT team leaders who reported to Torosian:

a.   Paul Jabbour - age 55 with 25 years of service (and therefore eligible for normal early retirement), was <u>terminated</u> in the SIRP.

b.   Dwayne Bush - age 54 with 30 years of service (and therefore vested in his full GRP retirement plus supplement), was <u>terminated</u> in the SIRP.

c.   Lori Hamilton - age 55, who had broken service with Ford prior to her most recent employment with the company and was therefore not accruing credit service towards a GRP pension milestone, was <u>retained</u>.

171.   Villanueva was fully qualified to perform jobs in Hardware Integration,

and in other departments, that were assigned to substantially younger and less-

qualified employees, as well as to employees who were not approaching GRP pension milestones.

172.   For example, after terminating Villanueva's employment, Defendant Ford assigned a substantially younger employee, Jason Dear (age 35 with 9 years of Ford experience, not GRP eligible), and also promoted Jeff Bizzak (age 33 at time of SIRP, approximately 9-12 years of Ford experience, not GRP eligible) to take over Villanueva's job duties and responsibilities, specifically as to the Everest and Volkswagen/Amarok joint venture programs (assigned to Dear) as well as the North American Ranger program (assigned to Bizzak).

173.   Ford replaced Villanueva with less experienced and less qualified individuals who either were not eligible for, or were not close to achieving, ERISA-protected Age and Service Milestones.

## PLAINTIFF JYOTHI CHAVA

**Disparate Treatment Age Discrimination Claim, Disparate Impact Age Discrimination Claim, Disparate Treatment based on Sex Discrimination, Disparate Treatment Claim based on Race/Ethnicity/National Origin Discrimination, and ERISA Discrimination and Interference Claims under 29 U.S.C. § 1140 (Section 510)**

174.   Plaintiff Jyothi Chava ("Chava"), age 53 at the time of termination, began her employment with Ford on July 14, 1997, and thus had 25.08 years of credited service in the GRP at the time of termination.

175.    Defendant notified Chava of her termination on August 22, 2022, and terminated Chava's employment effective August 31, 2022, under the SIRP.

176.    Thus, at the time of her termination from employment, Chava was 22 months away from her normal early retirement (55 and 10) milestone under the GRP, and was 4 years, 11 months away from her 30-year retirement milestone under the GRP.

177.    Chava has a Bachelor of Science degree in electrical and electronics engineering from Nagarjuna University, a master's degree in computer engineering from Wayne State University, and an MBA from the University of Michigan Ross School of Business.

178.    Throughout her employment with Ford, Chava has been a consistent and strong performer, receiving Achiever and Top Achiever ratings in her year-end performance reviews.

179.    Chava held a variety of positions throughout her 25 years of employment with Ford Motor Company and Ford Motor Credit Company, including:

a.  System engineer managing software development, 1997-2003.

b.  Application architect, 2003-2007.

c.  Business relationship manager, software development, 2007-2009.

d.  Information technology specialist, 2009-2013.

    e.  Solutions architect, 2016-2018.

    f.  Senior enterprise architect, 2016-2021.

    g.  Cloud Platform Consulting Architect (aka Consulting Enterprise Architect), 2021-2022.

180.   In December 2021, Ford promoted Chava from the position of Ford Model E Senior Architect, salary grade LL6, to the position of Model E Cloud Platform Consulting Architect, salary grade LL5.

181.   At the time of her termination, Chava held the position of Model E Cloud Platform Consulting Architect, salary grade LL5.

182.   In this position, Chava reported to Chief Architect Rick Buiteweg, LL4, who in turn reported to Jim Wasnick, LL3.

183.   As demonstrated by her experience in various positions at Ford, as well as by her recent promotion, Chava's skill set was very broad and was transferrable to many skills and functions that Ford needed for the future.

184.   At the time of her separation from employment, Chava was one of six LL5 level employees reporting to Rick Buiteweg.

185.   Chava, who is Indian-American, and the only other Indian-American woman reporting to Buiteweg were selected for separation, while Ford retained and did not separate the four Caucasian men at the LL5 level reporting to Buiteweg.

41

186.   After Ford terminated Chava's employment under the SIRP, it posted open positions and hired new, substantially younger employees into positions that Chava was better qualified to perform, including, but not limited to:

     a.  Senior Solution Architect.

     b.  Senior Solution Architect

     c.  Lead Consulting Architect.

     d.  Cloud Infrastructure Architect – Databases

     e.  Architect - Cloud Infrastructure and Databases

187.   In addition to hiring new employees to perform jobs that Chava was better qualified to perform, Ford also promoted substantially younger and less senior employees to perform jobs that Chava was better qualified to perform.

188.   Thus, Ford had a continuing need of Chava's skills and services when it terminated her and retained substantially younger employees in positions that Chava was better qualified to perform.

189.   Ford did not eliminate Chava's position or engage in a true reduction-in-force as to her position.

190.   Ford treated similarly situated and substantially younger employees more favorably than Chava in the process of separating personnel under the SIRP.

191.   Ford replaced Chava with less experienced and less qualified individuals who were not eligible for or were not approaching the achievement of ERISA-protected Age and Service Milestones.

192.   In the course of designing and implementing the SIRP, Ford treated similarly situated Caucasian males more favorably than Chava, as an Indian-American woman.

## PLAINTIFF CARRON ODOKARA

### Disparate Treatment Age Discrimination Claim, Disparate Impact Age Discrimination Claim, and ERISA Discrimination and Interference Claims under 29 U.S.C. § 1140 (Section 510)

193.   Plaintiff Carron Odokara ("Odokara"), age 52 at the time of termination, began her employment with Ford on May 23, 1994, and had 28.25 years of credited service under the GRP at the time of her termination.

194.   Defendant informed Odokara of her termination from employment on August 22, 2022, and terminated Odokara's employment effective August 31, 2022, under the SIRP.

195.   Thus, at the time of separation, Odokara was 587 days short of her 30-year GRP milestone and less than 3 years short of her 55 and 10 GRP milestone.

196.   Odokara earned a Bachelor of Science degree in electrical engineering from Kettering University, a Master of Science in computer science and engineering from the University of Michigan, a Ph.D. in organizational leadership from Eastern

University in Pennsylvania, and a Master of Divinity degree from Michigan Theological Seminary.

197.  Odokara was an outstanding employee throughout her employment with Ford, receiving Achiever and Top Achiever ratings in her annual performance reviews, as well as receiving "plus ups" in her annual bonus compensation in recognition of her outstanding performance over the years.

198.  Odokara demonstrated strong performance across a broad set of skills, as demonstrated by her employment history at Ford:

a.  1994-1999, multiple assignments within application development and support teams (salary grades GSR6-8).

b.  1994-1996, manufacturing systems analyst for parts plants.

c.  1996-1999, vehicle assembly plant floor systems.

d.  1999-2001, process and metrics manager, promoted to supervisor level position (salary grade LL6).

e.  2001-2005, product development systems manager.

f.  2005-2007, Six Sigma Black Belt.

g.  2007-2011, application and infrastructure monitoring tools team manager.

h.  2011-2022, multiple supervisor level (LL6) positions in IT Service Management (ITSM), specifically Process Owner, Service Architect, interim Service Manager, to support different parts of IT on the application and infrastructure sides (Business & Production Support Services for applications, End User Productivity, GOSH, Storage, and other infrastructure services).

199.   At the time of her separation from employment, Odokara worked in the position of Supervisor - Service Architect and Design, salary grade LL6, in an IT strategy organization within Information Technology Operations (ITO).

200.   Odokara reported to Kavitha Banavara, salary grade LL5, who in turn reported to Bob Mills, Director IT Operations Delivery Services, salary grade LL3.

201.   In 2022, Odokara led her team in defining and developing the skills and objectives for a role known as service/product designer (SD), and leading shift across the ITO organization to utilize the newly trained and professionally developed SD personnel.

202.   Odokara leveraged her vast skills (for example, as a business analyst, six sigma black belt, and service architect utilizing "service design and build" methodology) to develop and improve the capabilities of the SD personnel.

203.   Odokara supervised several GSR level employees who developed SD skills as part of this project, one of whom – Mandy Farwell (age early 30's) – moved to another position within ITO in August 2022 to work as a service designer.

204.   Farwell and the younger personnel whom Odokara developed as SD personnel retained their jobs and were not separated in the SIRP.

205.   Odokara's development of the service/product designer role is integral to the future needs of the Company, with some of the employees working as product designers being classified as High-Tech High Demand ("HTHD") with key skills

45

that could be utilized across the Company, including ITO, PDO, Mobility, and other organizations.

206.   As the person who led the definition and development of the SD role, Odokara demonstrated the performance, breadth of skills, and "skills for the future" that justified her continued her employment with Ford and disprove the asserted bases for her termination under the SIRP.

207.   On August 22, 2022, Mills informed Odokara that Ford was terminating her employment under the SIRP.

208.   After being informed that she had been selected for separation, Odokara knew that she was qualified to perform other open positions within the Company.

209.   Odokara asked Mills and other Company executives and managers if she could be considered for open positions instead of being separated, and she also inquired if she could be transferred or demoted to maintain her employment without breaking her GRP service, or if she could be bridged to her GRP retirement milestone, or if she could purchase service credits to reach her GRP retirement milestone.

210.   In her email to management, Odokara stated:

With 28.4 years of service at age 52 years of age, I have been privileged to join in the ongoing success of Ford. Most recently, I leveraged my qualitative and quantitative data analysis skills to lead my team in identifying improvements for customer experience as a Product/Service Designer. I was shocked and disappointed to be informed that August 31, 2022, would be my last day with the company with no provision to move me into another position

for which I am well qualified and with no alternative provision to bridge my time to retirement eligibility in 578 days.

I write this email to formally ask for another option in a company that prides itself on "caring for each other."

•    Option 1 – Leverage my many leadership and technical skills in another Ford position

•    Option 2 – Place me in a general salary role to continue utilizing my skills for Ford

•    Option 3 – Bridge my time to qualify for early retirement

•    Option 4 – Allow me to pay for the time to qualify for retirement with employee funding of the individual and company contributions to the pension fund

As a person who has been loyal and dedicated to the company, I would like you to consider using one of these options that align with the reputation Ford has as a "family company."
Thank you for your time and consideration.

Carron Odokara, Ph.D.
(Previously assigned as a Ford TSP Supervisor)

211.    In response, Ford HR representative Chris Basmadjian informed Odokara via email that there was "no provision available to extend the timing of your separation as requested, nor does the GRP include a provision to allow you to pay for time to qualify for retirement. These separation decisions were reviewed at multiple levels and are final."

212.    Basmadjian did not explain who made the "separation decisions," nor did he explain what the "multiple levels of review" were, nor did he explain who

was involved in each of the "multiple levels of review," nor did he explain why Ford could not place Odokara into a position, even though the Company retained younger employees in positions that Odokara was better suited to perform, and even though the Company posted open positions for jobs that Odokara was better suited to perform.

213.   In fact, Ford has published job postings for open positions that Odokara was qualified to perform, thus demonstrating that the Company had an ongoing need for her knowledge, skills, and qualifications, and that the Company did not engage in a bona fide reduction in force.

214.   Open positions that Odokara was qualified to perform include, but are not limited to:

      a.   Employee Engagement Analyst.

      b.   Business Architect.

      c.   Design Strategist – Experience Design.

      d.   Senior Strategist – Experience Design.

      e.   FordLabs Client Liaison.

      f.   Subscription Services Platform Product Manager.

      g.   Tech Lounge Team Lead.

215.   In addition to hiring new employees to perform jobs that Odokara was better qualified to perform, Ford also promoted substantially younger and less senior employees to perform jobs that she was better qualified to perform.

216.   Thus, Ford had a continuing need of Odokara's skills and services when it terminated her and retained substantially younger employees in positions that she was better qualified to perform.

217.   Ford did not eliminate Odokara's position or engage in a true reduction-in-force as to her position.

218.   Ford treated similarly situated and substantially younger employees more favorably than Odokara in the process of separating personnel under the SIRP.

219.   Ford replaced Odokara with less experienced and less qualified individuals who were not eligible for GRP benefits or were not approaching the achievement of ERISA-protected Age and Service Milestones.

## PLAINTIFF BRENDA SCHULTZ

### Disparate Treatment Age Discrimination Claim, Disparate Impact Age Discrimination Claim, FMLA Claim, and ERISA Discrimination and Interference Claims under 29 U.S.C. § 1140 (Section 510)

220.   Plaintiff Brenda Schultz ("Schultz"), age 51 at the time of termination, began her employment with Ford on 9/28/94, had 24.4years of credited service in the GRP at the time of termination.

221. Defendant notified Schultz of her termination on October 18, 2022, and terminated Schultz's employment effective 10/31/22, as part of the SIRP.

222. At the time of her termination, Schultz was 52 years old and had 24.4 years of credited service with Ford and was therefore 2 years and 11 months short of reaching the milestone for a normal early retirement (55 and 10) and 5.6 years short of reaching her 30-and-out retirement milestone under the GRP.

223. Schultz earned a Bachelor of Science degree in material science and mechanical engineering, with a minor in biomedical engineering, from Michigan State University, and an MBA with a concentration in Management Information Systems from Oakland University.

224. Over the course of her career with Ford, Schultz demonstrated strong performance and a broad skill set, as demonstrated by her work in the following positions:

   a. Program manager – wheel commodity lead, approximately 2018-2022.

   b. Service information development engineer, approximately 2015-2018.

   c. Human occupant protection system engineer, approximately 2014-2015.

   d. Technical learning specialist, approximately 2011-2014.

   e. Program module team integration lead engineer, approximately 2005-2011.

   f. Design engineer, approximately 2002-2004.

g.  Cost engineer, approximately 1999-2001.

h.  Industrial engineer, approximately 1997-1999.

i.  Manufacturing engineer, approximately 1994-1997

225.    At the time of separation, Schultz held the position of program manager analyst (also known as "PMA" or "Program Manager"), salary grade GSR 8, in the Company's vehicle personalization organization.

226.    In this position, Schultz reported to Melanie Smith, salary grade LL6, vehicle personalization planning and program management supervisor.

227.    In turn, Smith reported to Mark Wilson, salary grade LL5, vehicle personalization planning and operations manager.

228.    Wilson reports to Eric Cin, salary grade LL4, global director vehicle personalization.

229.    In her year-end Performance Review for 2021, Schultz received an overall rating of Achiever with the following comments from her people leader, Melanie Smith:

> This past year, as the Program Manager for the Wheel commodity and Edge program, Brenda continues to successfully lead the team using her strong organization skills to launch programs on time and compete like a challenger. Her knowledge and experience with the wheel commodity allows her to apply lessons learned and support the planning team in identifying new wheel programs. She is thorough and detail oriented which helps teams stay on track while providing clear communication to external and internal customers. She develops and maintains

positive working relationships with the teams and is proactive in reaching out to team members to resolve issues in a timely manner such as seen on the CX430 and V363 wheel program.

Next year, Brenda will continue to own the wheel commodity with the increasing complexity of wheel designs. Using her wealth of knowledge, I encourage Brenda to identify opportunities and make decisions that support the Ford+ plan to simpl[if]y and modernize. One area of opportunity for Brenda is becoming more proficient with Dealer Channel accessories. This would demonstrate that she is an SME for all VP program managers and share that knowledge with new PM's as they join VP. Brenda is a tremendous asset to the organization and we are very fortunate to have her [as] part of the team.

230. On October 18, 2022, Schultz returned from an approved medical leave of absence which had begun in late July 2022.

231. Wilson informed Schultz that she had been selected for separation under the SIRP, telling her that the Company had restructured and that there was no longer a position for her at Ford.

232. The stated reason for Schultz's selection for separation is demonstrably false, as proven by Ford's advertisements, postings, and recruitment for program manager positions that Schultz was fully qualified to perform, and to which she could have been transferred instead of being terminated.

233. Shortly after Schultz was terminated, Ford replaced her with another employee, Andrew Thomas, who is now performing the duties and responsibilities that Schultz performed prior to termination.

234.   Unlike Schultz, Thomas – hired by Ford in 2006 – is not eligible for a GRP defined benefit pension benefit and was not approaching ERISA-protected Age and Service Milestones.

235.   In addition to replacing Schultz with another employee who is not accruing service credits towards a GRP pension milestone, Ford has also advertised, posted, and recruited to hire new, substantially younger, and non-GRP eligible employees to perform jobs that Schultz was better qualified to perform:

236.   These positions include but are not limited to:

a.   Program Manager in vehicle personalization, posted as purchased service. Schultz inquired if she could accept this position and Ford informed her that she could not.

b.   Model e Program Manager.

c.   Program Management Supervisor.

d.   Product Development Engineer (11 postings).

e.   Manufacturing Engineer.

f.   TVM - Engineer (2 positions).

237.   Thus, Ford had a continuing need of Schultz's skills and services when it terminated her and retained substantially younger and non-GRP eligible employees in positions that Schultz was better qualified to perform and hired younger and non-GRP eligible employees into positions that she was better qualified to perform.

238.   Ford did not in fact eliminate Schultz's position or engage in a true reduction-in-force as to her position.

239.   Ford treated similarly situated and substantially younger and non-GRP eligible employees more favorably than Schultz in the process of separating personnel under the SIRP.

240.   Ford replaced Schultz with less experienced and less qualified individuals who were not eligible and were not approaching ERISA-protected Age and Pension Milestones.

## PLAINTIFF NANCY WEGRYN

**Disparate Treatment Age Discrimination Claim, Disparate Impact Age Discrimination Claim, Disparate Treatment Sex Discrimination Claim, and ERISA Discrimination and Interference Claims under 29 U.S.C. § 1140 (Section 510)**

241.   Plaintiff Nancy Wegryn ("Wegryn"), age 52 at the time of termination, began her employment with Defendant Ford Motor Company on October 11, 1993, and thus had 28.83 years of credited service in the GRP at the time of termination.

242.   Defendant notified Wegryn of her termination on August 22, 2022, and terminated Wegryn's employment effective August 31, 2022, under the SIRP.

243.   Thus, at the time of her termination from employment, Wegryn was 52 years old and was 13 months away from her 30-year retirement milestone under the GRP.

244.    Wegryn has a Bachelor of Science degree in Industrial Engineering from West Virginia University, and a Master's Degree in Business Administration, International Business & Marketing from Case Western Reserve.

245.    Throughout her employment with Ford, Wegryn has been a consistent and strong performer, receiving Achiever ratings in her year-end performance reviews, and in her last review being identified by her manager as being "on the bubble" for a Top Achiever rating.

246.    Wegryn held a variety of GSR 8 positions throughout her 28.9 years of employment with Ford Motor Company including:

a.  Cycle PlanTechnology Modular Specialist, 2017-2019

b.  Vehicle Pre-Production Planning- Ford Fusion, 2014-2017

c.  Program Management, Body Interior Integration Engineer, 2007-2014

d.  Seat Design and Release Engineer, 2002-2007

e.  Manufacturing    Engineering/PVT    Engineering    at    Ohio    Assembly/Loraine Assembly, 1993-2002

247.    Since 2019, Wegryn held the position of Technology Features Strategy Planner, salary grade GSR 8.

248.    In this position, Wegryn reported to Supervisor Michelle McQuaid, LL6, who in turn reported to Tom Skwirsk, LL4.

249.   Wegryn's skill set was very broad and was transferrable to many skills and functions that Ford needed for the future.

250.   At the time of her separation from employment, Wegryn was one of eight GSR 7/8 level Planners working under Manager Tom Skwirsk and reporting directly to Michelle McQuaid for day-to-day operations.

251.   Of the eight GSR 7/8 planners working under Skwirsk, Wegryn was the closest to her pension milestones, while the older employees in the group were not eligible to attain the age and service milestones under the GRP.

252.   At the time of her termination, Wegryn was exceeding her yearly goals and was deemed by the other planners as a leader in the department.

253.   On February 1, 2022, Wegryn received written notification that she was designated by Ford as a "High Tech High Demand" employee and was therefore assigned to a higher salary range than standard GSR 8 salary, along with increased compensation under Ford's enhanced Annual Incentive Compensation bonus target.

254.   The High-Tech High Demand Program was initiated by Ford in order to identify "critical positions required to support our strategic priorities" and a means of retaining professionals in specific technical positions.

255.   In August of 2022, after Ford terminated Wegryn's employment under the SIRP, it transferred Mike Duer, a substantially younger employee from another department, to perform jobs that Wegryn was better qualified to perform.

256.   Thus, Ford had a continuing need of Wegryn's skills and services when it terminated her and retained substantially younger employees in positions that Wegryn was better qualified to perform.

257.   Ford did not eliminate Wegryn's position or engage in a true reduction-in-force as to her position.

258.   Ford treated similarly situated and substantially younger employees more favorably than Wegryn in the process of separating personnel under the SIRP.

259.   Wegryn, who was approximately 13 months from attaining her pension milestone, was selected for separation, while Ford retained and did not separate younger and less experienced employees at the GSR 8 level reporting to McQuaid, none of whom were close to achieving any retirement milestones.

260.   Ford replaced Wegryn with less experienced and less qualified individuals who were not eligible and were not close to achieving ERISA-protected Age and Service Milestones.

261.   In the course of designing and implementing the SIRP, Ford treated similarly situated males more favorably than Wegryn, as a woman.

262.   In comments posted on September 22, 2022, Wegryn's former Supervisor McQuaid described her as a natural leader and a quick study that she would not hesitate to have on her team in the future.

263.   On August 22, 2022, Manager Tom Skwirsk (LL5) informed Wegryn that she had been selected for separation under the SIRP and that the reason for her separation was her "breadth of skills."

264.   The stated reason for Wegryn's selection for separation is false, as proven by her demonstrably broad skill set in her over her 28+ years of employment with Ford, as well as by her designation as a High Tech High Demand employee with corresponding salary and bonus increases, and by the positive comments from her direct supervisors in her quarterly Performance Review check-ins.

## PLAINTIFF GREG PENN

## Disparate Treatment Age Discrimination Claim, Disparate Impact Age Discrimination Claim, and ERISA Discrimination and Interference Claims under 29 U.S.C. § 1140 (Section 510)

265.   Plaintiff Greg Penn ("Penn), age 51 at the time of termination, began his employment with Ford on February 19, 2001, and thus had 21.5 years of credited service in the GRP at the time of termination.

266.   Defendant informed Penn of his termination from employment on August 22, 2022, and terminated his employment effective August 31, 2022, under the SIRP.

267.   At the time of termination, Penn was 51 years-old with 21 years, 6 months of credited service under the GRP.

268.   Thus, at the time of separation, Penn was approximately 3.5 years short of his 55 and 10 normal early retirement GRP milestone.

269.   Penn earned a Bachelor of General Studies degree from Ball State University, a Master's Degree in Human Resources management from Purdue University, and a Master's in Science of Finance from the Kelley School of Business at Indiana University.

270.   Penn was an outstanding employee throughout his employment with Ford, most recently receiving a final rating of Top Achiever for his 2021 year-end performance review.

271.   Penn's directors, managers, and supervisors also frequently praised his performance throughout the years, both verbally and in writing.

272.   Penn's last position with Ford Motor Company was procurement specialist and budget analyst, salary grade GSR 8.

273.   In that position, Penn reported to Eric Sholander ("Sholander"), budget operations leader, salary grade LL6, who in turn, reported to Soraya Kim, CTO chief of staff – research and advanced ("R&A") organization, salary grade LL4.

274.   Penn demonstrated strong performance across a broad set of skills and duties in varying skill teams, as demonstrated by his employment history at Ford.

275.   Penn was routinely assigned complex, high-exposure duties, which he performed in a consistently outstanding manner.

276.   Since taking on the position of procurement specialist and budget analyst in 2018, Penn served as a business/research analyst with a broad range of responsibilities, including but not limited to: creating purchase orders in Ford's Aurora system, managing purchase orders/requisitions, as well as Modular Control Review Process (MCRP) evaluator, managing open issues within budget/finance topics for all departments within R&A, partnering with lead budget analyst to ensure accurate reporting of department budgets, managing the department budget for powertrain and controls (J061), managing fab card reconciliation for J060, 1, 3, and 4, training week product owner for controls and automated systems ("CAS") department.

277.   Penn also worked as a project lead responsible for delivering an electronic procurement system for the R&A organization.

278.   In October 2021, in addition to the responsibilities described above, Penn was assigned responsibility for the overall CAS department budget, which included all departments within CAS.

279.   Penn's final 2021 performance review included the following comments:

> Greg had great year in his new role of procurement specialist and budget analyst supporting CAS, Finance and the Business Office. He also did an outstanding job supporting the CAS training week and training new auditors in the MCRP process. Greg was also very involved in documenting procurement

processes, analyzing those processes and developing improvements to the processes. Late in the year he took on new responsibilities in CAS as lead budget analyst with a good attitude. I look forward to seeing him grow and flourish in this new role in 2022.

Greg exhibits the "Built Ford Tough" Ford Truth.

For areas of growth and development, Greg will continue to develop his body of knowledge of the procurement process and finance. I also look forward to his participation or leadership of process improvements.

Feedback from Others

"I am impressed and appreciative that Greg always demonstrates "Care for each Other" and Putting People First by taking the time to listen to my questions and provide detailed explanations often including examples to further aid my understanding."

"Greg is very flexible and tries to make himself available to contribute when needed"

"Now that Greg has taken over for Donna Bauman in preparing the material for Craig's budget SAR, I expect that in this role we will continue to interact in a similar way by clearly communicating with multiple department budget representatives to get the budget and headcount information he needs to put together the information for the SAR"

"Greg wants to Do the Right Thing by following procedures. Greg is always enthusiastic and has applied "Be Curious" to his everyday work by always looking for new way to do things and is not afraid to ask questions."

"Greg is responsive to requests and does the best he can, given a high workload, to accommodate everything as quickly as possible."

"Greg was almost solely responsible for CAS Training Week this year, and I think he did a fantastic job. He put the system in place last year and was able to better refine it this year for a great user experience. His dedication here really showed through in an excellent end product."

280.   In early 2022, Ford assigned Penn's MCRP responsibilities to a substantially younger co-worker, Angela Wang ("Wang"), who was in her 40's, and who was not selected for separation in the SIRP.

281.   As recently as mid-August 2022, Sholander acknowledged Penn's strong performance, breadth of skills, and demonstrated value to the Company by praising his performance and asking if he would be interested in a promotion to the LL6 level.

282.   In response to Sholander's comments, Penn stated affirmatively that he was interested in a promotion to the LL6 level.

283.   On August 22, 2022, Sholander informed Penn that Ford was terminating his employment under the SIRP.

284.   Sholander told Penn that Ford was eliminating his position, which directly contradicted the OWBPA disclosure provided to Penn at the time of his separation under the SIRP showing that Ford retained employees in the position of procurement specialist and budget analyst and did not eliminate the position of procurement specialist and budget analyst.

285.   Furthermore, Ford did not eliminate Penn's position as demonstrated by the fact that it transferred a substantially younger, non-GRP eligible employee (Elizabeth Perez) to a position within R&A just prior to the August 22, 2022 restructuring action.

286.   Ford did not in fact eliminate Penn's position, as demonstrated by the fact that Penn's job duties and responsibilities are still performed and are performed, at least in part, by substantially younger employees, including Perez and Wang, who were not selected for separation under the SIRP.

287.   At the time of his separation, Penn was qualified to perform other open positions within the Company based on his training, knowledge, broad skill set, and aptitude for open positions where he could have been utilized.

288.   For example, at the time of separation, there was an open lateral position in the budget team within Penn's home department for government contracts, responsible for general auditing duties, financial reconciliation, and other duties that Penn was most suitable for performing based on his core skill set and prior experience as a lead budget and research analyst.

289.   Ford cannot justify denying Penn a lateral transfer to a position in his home department for which he is at least equally qualified and has proven adept at handling very complex roles, as stated above.

290.   At the time of termination, there were other open positions that Penn was fully qualified and most suitable for, including an HR position in the Company's Chicago stamping plant and other positions, including HR positions, throughout the Ford system.

291.   After being informed of his separation, Penn asked Sholander if he had considered transferring him to an open position, and Sholander stated that transfers were not considered and that all decisions were final.

292.   Penn was suitable for placement in finance positions, budget and research analyst positions, HR positions, and other open positions, based on his performance, skills, and breadth of skills.

293.   Ford has published job postings for open positions that Penn was qualified to perform, thus demonstrating that the Company had an ongoing need for his knowledge, skills, and qualifications, and that the Company did not engage in a bona fide reduction in force.

294.   Open positions that Penn was qualified to perform include, but are not limited to, the positions described above.

295.   Furthermore, Ford recently posted an ADAS budget rep role, which was very similar to Penn's position, that required 10+ years of relevant experience and was at the leadership level, thus demonstrating the breadth and complexity of Penn's lead budget rep role in CAS and further demonstrating that Ford is hiring younger, non-GRP eligible employees in positions that Plaintiffs are qualified to perform.

296.   In addition to hiring new employees to perform jobs that Penn was better qualified to perform, Ford also promoted substantially younger and less senior employees to perform jobs that he was better qualified to perform.

297.   Thus, Ford had a continuing need of Penn's skills and services when it terminated his employment and retained substantially younger employees in positions that he was better qualified to perform.

298.   Ford did not eliminate Penn's position or engage in a true reduction-in-force as to his position.

299.   Ford treated similarly situated and substantially younger employees more favorably than Penn in the process of separating personnel under the SIRP.

300.   Ford replaced Penn with less experienced and less qualified individuals who were not eligible for or were not approaching the achievement of ERISA-protected Age and Service Milestones.

## PLAINTIFF DANA TROMBAT

## Disparate Treatment Age Discrimination Claim and ERISA Discrimination and Interference Claims under 29 U.S.C. § 1140 (Section 510)

301.   Plaintiff Dana Trombat ("Trombat"), age 47 at the time of termination, began her employment with Ford on August 23, 1999 and had 23 years of service at the time of her termination.

302.   Defendant informed Trombat of her separation from employment on August 23, 2022, and terminated her employment effective August 31, 2022, under the SIRP.

303.   Trombat has a Bachelor's Degree in Chemistry from Lawrence Technological University.

304.   At the time of her separation, Trombat worked as a product development engineer/powertrain calibration engineer, salary grade SG8.

305.   In this position, Trombat reported to the supervisor of dyno-feature calibration, Dan Blokker ("Blokker"), salary grade LL6.

306.   In turn, Blokker reported to Scott Makowski, manager, salary grade LL5.

307.   Over the course of her 23-year career at Ford, Trombat held the following positions:

     a.   Ford College Graduate (FCG) program, rotating through various positions for 24 months, from 1999-2001.

     b.   Laboratory engineer, approximately 2001-2016.

     c.   Powertrain calibration engineer, 2016-2022.

308.   Throughout her employment with Ford, Trombat was an excellent performer, culminating most recently in a written commendation and salary increase, in recognition outstanding contributions in May 2021.

309.   At the time of the SIRP, Trombat was one of approximately ten GSR employees (7 calibration engineers and 3 non-engineers) reporting to Blokker.

310.   Trombat was the only one of the GSR employees who was selected for separation in the SIRP.

311.   One of the comparable employees who was retained, Rob Novak, had already reached his 30-year pension milestone under the GRP.

312.   Ford retained newer and substantially younger employees in positions that Trombat was better qualified to perform, including: Andrew Zetts (age 32, hired 2015), Ann-Marie Zugaj (approximately age 39, hired 2011), Charles Pinzone (approximately age 28, less than 2 years dyno calibration experience, joined section in 2020-2021), and Amanda Pfetzenreuter (approximately age 28, less than 2 years dyno calibration experience, joined section in 2020-2021).

313.   Trombat's department was expanding and adding personnel in recent years, thus demonstrating that Ford did not engage in a bona fide reduction-in-force in her area.

314.   In addition, Ford has continued to post for and hire substantially younger employees into positions that Trombat was better suited to perform, including, but not limited to:

    a.  Battery Cell Scientist.

    b.  Propulsion System Calibration Engineer.

    c.  Vpse Calibration Engineer.

    d.  Battery Cell Integration and Test Engineer.

    e.  Vehicle Controls/Powertrain Sub-System Modelling Engineer.

315.   In addition to hiring new employees to perform jobs that Trombat was better qualified to perform, Ford also promoted substantially younger and less senior employees to perform jobs that she was better qualified to perform.

316.   Thus, Ford had a continuing need of Trombat's skills and services when it terminated her and retained substantially younger employees in positions that Trombat was better qualified to perform.

317.   Ford did not eliminate Trombat's position or engage in a true reduction-in-force as to her position.

318.   Ford treated similarly situated and substantially younger employees more favorably than Trombat in the process of separating personnel under the SIRP.

319.   Ford replaced Trombat with less experienced and less qualified individuals who were not eligible for or were not approaching the achievement of ERISA-protected Age and Service Milestones.

**PLAINTIFF JENNIFER MERIDETH**

**Disparate Treatment Age Discrimination Claim, Disparate Impact Age Discrimination Claim, Disparate Treatment Sex Discrimination Claim, and ERISA Discrimination and Interference Claims under 29 U.S.C. § 1140 (Section 510)**

320.   Plaintiff Jennifer Merideth ("Merideth"), age 53 at the time of termination, began her employment with Ford on March 29, 1993, and thus had 29.5 years of credited service in the GRP at the time of termination.

321.   Defendant notified Merideth of her termination on August 22, 2022, and terminated Merideth's employment effective August 31, 2022, under the SIRP.

322.   Thus, at the time of her termination from employment, Merideth was just 5 months away from her 30-year retirement milestone under the GRP.

323.   Merideth has a Bachelor of Science in Mechanical Engineering degree from Michigan State University.

324.   Throughout her employment with Ford, Merideth was a consistent and strong performer, receiving Achiever and Top Achiever ratings in her year-end performance reviews.

325.   Throughout Merideth's 29-year career with Ford Motor Company, she worked as a Product Development Engineer in the Transmission Drive Line Engineering Department and, subsequently, the Ford Performance Department where she worked on the GT500, as well as the Raptor models.

326.   At the time of her termination, Merideth held the position of Product Development Engineer, salary grade GSR8, within the Ford Performance Department.

327.   In this last position, Merideth reported to Powertrain Engineering Supervisor George MacDonald ("MacDonald"), salary grade LL6.

328.   MacDonald reported to Ford Performance Powertrain Manager Pat Morgan, salary grade LL5, who, in turn, reported to Chief Engineer Carl Widmann, salary grade LL3.

329.   Merideth's skill set was very broad and was transferrable to many skills and functions that Ford needed for the future.

330.   Merideth's annual performance reviews consistently contain praise from supervisors regarding her expertise, efficiency, leadership, and excellent performance, including but not limited to the following:

    a.   "Jennifer's expertise in understanding powertrain systems was valuable in reviewing potential current model changes."

    b.   "Jennifer has extensive knowledge and experience in the calibration field."

    c.   "Jennifer delivered outstanding performance in several diverse assignments . . . Jennifer is the go-to engineer for both program control and systems workload due to her extensive technical and program management skillset and experience. In particular, Jennifer's calibration background enabled effective vehicle trouble shooting. She works very well with a fluid mix of standard objectives and special assignments. She has a thorough understanding of transmission function and GPDS

program delivery that she shares through her mentoring of her core and spoke colleagues."

331.   At the time of her separation, Merideth was one of four Product Development Engineers reporting to MacDonald working on Raptor Power Train.

332.   Of those working on Raptor Power Train who reported to MacDonald, Merideth had, by far, the most experience, was the oldest, as well as the only female, and was likewise the only one eligible for pension benefits under the GRP.

333.   Despite Merideth's expertise and senior experience, MacDonald was unjustifiably critical of her performance, behaved coldly towards her, excluded her from media events and from taking company cars to Formula SAE Michigan despite allowing her younger male coworkers to do so.

334.   After Ford terminated Merideth's employment under the SIRP, it posted open positions and hired new, substantially younger employees into positions that Merideth was better qualified to perform, including, but not limited to:

    a.   High Voltage Battery Systems Engineer

    b.   Product Development Engineer (11 positions)

    c.   Exhaust Aftertreatment Development Engineer

    d.   Benchmarking Engineer

    e.   Vehicle Controls - New Technology Development Engineer

    f.   Electrical Component Engineer

g.  Internal Propulsion Thermal Systems Design and Release Engineer

h.  Program Control Engineer

i.  eDrive Inverter Power Modules D&R

j.  HV Battery Array Electrical D&R Engineer

k.  HV Battery Array Structural Component D&R Engineer

l.  High Voltage Battery Package & Release Engineer

m. PD Engineer - Fluids and Materials

n.  Power Unit Systems Engineer

o.  Product Development Coordinator

p.  Electric Drive Unit Systems Engineer

q.  Electrified Development Engineer

r.  Fuel Systems Development Testing Engineer

s.  Inverter Process Systems

t.  Fuel Economy and Performance Engineer

335.   In addition to hiring new employees to perform jobs that Merideth was better qualified to perform, Ford also promoted substantially younger and less senior male employees to perform jobs that Merideth was better qualified to perform.

336.   Thus, Ford had a continuing need for Merideth's skills and services when it terminated her and retained substantially younger male employees in positions that Merideth was better qualified to perform.

337.   Ford did not eliminate Merideth's position or engage in a true reduction-in-force as to her position.

338.   Just a few weeks before Merideth's termination, a significantly younger male employee was transferred into Ford Performance to work on Raptor Power Train, effectively replacing Merideth upon her termination.

339.   Ford treated similarly situated and substantially younger male employees more favorably than Merideth in the process of separating personnel under the SIRP.

340.   Ford replaced Merideth with less experienced and less qualified individuals who were not eligible for or were not approaching the achievement of ERISA-protected Age and Service Milestones.

## PLAINTIFF MICHELE REICHENBACH

### Disparate Treatment Age Discrimination Claim, Disparate Impact Age Discrimination Claim, and ERISA Discrimination and Interference Claims under 29 U.S.C. § 1140 (Section 510)

341.   Plaintiff Michele Reichenbach ("Reichenbach"), age 54 at the time of termination, began her employment with Ford on January 16, 1990, and had 28.4 years of credited service in the GRP at the time of termination.

342.   Defendant notified Reichenbach of her termination on August 22, 2022, and terminated Reichenbach's employment effective August 31, 2022, under the SIRP.

343.   At the time of her termination, Reichenbach was 54 years old and had 28.4 years of credited service with Ford and was, therefore, 8 months short of her normal early retirement (55 and 10) milestone under the GRP and was 18 months away from her 30-year retirement milestone under the GRP.

344.   Reichenbach has a Bachelor of Science degree in Electrical Engineering from Oakland University and a Master of Science degree in Electronics and Computer Control Systems from Wayne State University.

345.   Throughout her employment with Ford, Reichenbach was a consistent and strong performer, receiving Achiever ratings in her year-end performance reviews.

346.   Reichenbach held a variety of positions throughout her 32 years of employment with Ford Motor Company, including:

  a.  Product Development Engineer, 1990-1992.

  b.  Powertrain Calibration Engineer, 1992-1998.

  c.  Advanced Onboard Diagnostics - Product Development Engineer, 1998-2001.

  d.  Powertrain Controls Research & Advanced - Product Development Engineer, 2001-2008.

  e.  Powertrain Control Module Diagnostics - Product Development Engineer, 2009-2022.

347.   At the time of her termination, Reichenbach held the position of Product Development Engineer, salary grade GSR8.

348.   In this last position, beginning in January 2021, Reichenbach reported to Onboard Diagnostics Supervisor Steve Bandy ("Bandy"), salary grade LL6.

349.   Bandy reported to Onboard Diagnostics Manager Heidi Mueller, salary grade LL5, who, in turn, reported to Assistant Chief Engineer Owen Bailey, salary grade LL4.

350.   Reichenbach's skill set was very broad and was transferrable to many skills and functions that Ford needed for the future.

351.   Reichenbach's annual performance reviews consistently contain praise from supervisors regarding her expertise, efficiency, leadership, and excellent performance, including but not limited to the following:

   a.   "Ms. Reichenbach is very thorough, persistent and professional in her approach. The Part 2 process is now starting to formalize into a process and she has ably applied her skills to deliver this documentation with quality for numerous programs including some that were completely unexpected/unplanned."

   b.   "Michelle is very thorough and complete in her production of Part II documents. She is always willing to assist and answer questions from FCSD or any other customer…She can be counted on to deliver her work on time, including working in the evening and on weekends from home. She will help out other team member [sic] if they are overloaded."

   c.   "Ms. Reichenbach delivers a large number of Part 2 documents with high quality and efficiency. She guides the team and communicates well when help is needed. She demonstrates knowledge of both the product requirements and the process to create them. This insight will be necessary as we make changes to the software and look for ways to become even more efficient. Ms. Reichenbach should continue to be a leader and go-to person for Part 2s. She should be active and vocal in

developing and refining the process as it changes to accommodate the Vector DCM."

    d.  Reichenbach was a contributing inventor on several patents critical to Ford: NOx Sensor Monitoring, Active lean NOx Catalyst Diagnostics, and Diesel Aftertreatment Systems.

352.  At the time of her separation, Reichenbach was one of four Engineers (Reichenbach plus one Agency Engineer, one Purchased Service Engineer, and one Ford of Mexico Engineer) reporting to Bandy working on the Part II specification process for three electronic control modules: Powertrain, Transmission, and Driveline.[3]

353.  Of those working on the specification process for these modules, Reichenbach had, by far, the most experience and was likewise the only one eligible for pension benefits under the GRP.

354.  After Ford terminated Reichenbach's employment under the SIRP, it posted open positions and hired new, substantially younger employees into positions that Reichenbach was better qualified to perform, including, but not limited to:

    a.  On-Board Diagnostics Production Vehicle Evaluation - Test Engineer.

    b.  Core Electrical Architecture Engineer.

    c.  Product Engineer Calibration.

    d.  Product Development Engineer (3 positions).

---

[3] Ford did not provide Reichenbach with her 2021 Performance Review, completed by Bandy, in response to her request for personnel records under the Michigan Employee Right-to-Know Act.

e.  Program Control Engineer.

f.  Vehicle Controls - New Technology Development Engineer.

355.  In addition to hiring new employees to perform jobs that Reichenbach was better qualified to perform, Ford also promoted substantially younger and less senior employees to perform jobs that Reichenbach was better qualified to perform.

356.  Thus, Ford had a continuing need of Reichenbach's skills and services when it terminated her and retained substantially younger employees in positions that Reichenbach was better qualified to perform.

357.  Ford did not eliminate Reichenbach's position or engage in a true reduction-in-force as to her position

358.  Ford treated similarly situated and substantially younger employees more favorably than Reichenbach in the process of separating personnel under the SIRP.

359.  Ford replaced Reichenbach with less experienced and less qualified individuals who were not eligible for or were not approaching the achievement of ERISA-protected Age and Service Milestones.

**PLAINTIFF ELIZABETH GILMOUR**

**Disparate Treatment Age Discrimination Claim, Disparate Impact Age Discrimination Claim, and ERISA Discrimination and Interference Claims under 29 U.S.C. § 1140 (Section 510)**

360. Plaintiff Elizabeth A. Gilmour ("Gilmour"), age 52 at the time of termination, began her career with Ford as an independent contractor in August of 1992.

361. On November 1, 1999, Gilmour was hired as a Ford Motor Company employee.

362. Defendant notified Gilmour of her termination on August 22, 2022, and terminated Gilmour's employment effective August 31, 2022, under the SIRP.

363. Thus, at the time of her termination from employment, Gilmour had 22.75 years of credited service in the GRP, was 33 months away from her normal early retirement (55 and 10) milestone under the GRP and was 7 years and 2 months away from her 30-year retirement milestone under the GRP.

364. Gilmour has a Bachelor of Arts degree in Advertising from Michigan State University.

365. Throughout her employment with Ford, Gilmour was a consistent and strong performer, receiving Achiever and Top Achiever ratings in her year-end performance reviews.

366. Gilmour held a variety of positions throughout her nearly 30 years of working for Ford Motor Company, including:

    a. Program Management Specialist, 1999-2001.

    b. Program Management Coordinator, 2001-2004.

    c. Budget and Special Project Coordinator - Financial Analyst/Auditor, 2004-2010.

    d. Global Advertising Management Operations Analyst, 2011-2018.

    e. Global Marketing Sales and Service Learning and Development Manager, 2018-2022.

367. In or around February of 2018, Ford promoted Gilmour from the position of Global Advertising Management Operations Analyst, salary grade GSR 8, to the position of Global Marketing Sales and Service Learning and Development Manager, salary grade LL6.

368. At the time of her termination, Gilmour held the position of Global Marketing Sales and Service Learning and Development Manager, salary grade LL6.

369. In this last position, Gilmour reported to Global Marketing Operations Manager Keith Koeppen ("Koeppen"), salary grade LL4, who, in turn, reported to Kimberly Cape, Director of Global Brand and Integrated Marketing, salary grade LL3.

370. Gilmour's skill set was very broad and was transferrable to many skills and functions that Ford needed for the future.

371.   Gilmour's annual performance reviews consistently contain praise from supervisors regarding her expertise, efficiency, and excellent performance, including but not limited to the following:

   a.   "…she is efficient and concise and manages her time extremely well in order to provide so much results for our team."

   b.   "Committed to excellence, always well-prepared for release meetings & budget review meetings."

   c.   "She consistently achieves objectives well above expectations…"

   d.   "Beth always delivers results, when asked to do something she works to complete the objective both timely and above standard expectations."

   e.   "…the new member of ICO, leaned heavily into Beth's expertise resulting in her acting as a mentor to them and she provided support and direction to many other members for their MCRPs and BCP"

   f.   "Beth was also part of the team that was nominated and awarded for the 2016 Diversity and Inclusion Award Recipient - Promoting Worklife Flexibility, a very big accomplishment!!!"

   g.   "Beth has done an incredible job."

   h.   "She [Gilmour] willingly takes on more work with a high degree of attention to detail and the objectives. Beth is currently on the next up list, exemplifying her drive and continuous high performer status and is being considered for available jobs."

372.   After Ford terminated Gilmour's employment under the SIRP, it posted open positions and hired new, substantially younger employees into positions that Gilmour was better qualified to perform, including, but not limited to:

   a.   Marketing Sales and Service - Executive Coordinator (2 positions).

80

b. Marketing Sales and Service - Digital Program Manager.

c. Product Development - Business Launch and Operations Manager.

d. Human Resources - Single Point of Contact (SPOC) National Attendance Program (NAP).

e. Manufacturing - Material Planning & Logistics Supervisor-KTP.

f. Communications - Communications Coordinator.

g. Government & Community Relations-Economic Mobility Specialist.

h. Human Resources - Human Resources/Attendance Specialist.

i. Marketing Sales and Service - Digital Program Manager (2 positions).

j. Design - XD Producer.

k. Product Development - Business Launch and Operations Manager.

l. Human Resources - Human Resource Associate-Supplemental.

m. Communications - FordLabs Communication Specialist.

n. Ford Pro-Marketing - Digital Content Specialist.

373.   In addition to hiring new employees to perform jobs that Gilmour was better qualified to perform, Ford also assigned, transferred, or promoted substantially younger and less senior employees to perform jobs that Gilmour was better qualified to perform.

374.   Thus, Ford had a continuing need of Gilmour's skills and services when it terminated her and retained substantially younger employees in positions that Gilmour was better qualified to perform.

81

375.   Ford did not eliminate Gilmour's position or engage in a true reduction-in-force as to her position.

376.   Ford treated similarly situated and substantially younger employees more favorably than Gilmour in the process of separating personnel under the SIRP.

377.   Ford replaced Gilmour with less experienced and less qualified individuals who were not eligible for or were not close to becoming achieving ERISA-protected Age and Service Milestones.

## PLAINTIFF DANIEL BALOGH

**Disparate Treatment Age Discrimination Claim and ERISA Discrimination and Interference Claims under 29 U.S.C. § 1140 (Section 510)**

378.   Plaintiff Daniel Balogh ("Balogh"), age 49 at the time of termination, began his employment with Ford on June 3, 1993, and thus had 29.25 years of credited service in the GRP at the time of termination.

379.   Defendant notified Balogh of his termination on August 22, 2022, and terminated Balogh's employment effective August 31, 2022, under the SIRP.

380.   Thus, at the time of his termination from employment, Balogh was just 9 months away from his 30-year retirement milestone under the GRP.

381.   Throughout his employment with Ford, Balogh was a consistent and strong performer, receiving Achiever and Top Achiever ratings in his year-end performance reviews.

382.   Balogh held a variety of positions throughout his 29 years of employment with Ford Motor Company, including:

    a.  UAW Final Inspector, 1993-2001

    b.  Production Supervisor, 2001-2003

    c.  Material Control Analyst, 2003-2008

    d.  Senior Material Control Analyst, 2008-2022

383.   At the time of his termination, Balogh held the position of Senior Material Control Analyst, salary grade GSR8, within the Pre-Production Management Department.

384.   In this last position, Balogh reported to Power Train Prototype David Sheets ("Sheets"), salary grade LL6.

385.   Sheets reported to Pre-Production Management Department Manager Mike Paskus, salary grade LL5, who, in turn, reported to Todd Bryant, Director of Material Planning and Logistics, salary grade LL3.

386.   Balogh's skill set was very broad and was transferrable to many skills and functions that Ford needed for the future.

387.   Balogh's annual performance reviews consistently contain praise from supervisors regarding his expertise, efficiency, leadership, and excellent performance, including but not limited to the following:

    a.  "Dan's an extremely valuable member of my team!"

b. "Mr. Balogh continues to demonstrate his highly developed skills set and leadership on a daily basis in managing the most difficult and complex engine programs in NA. Mr. Balogh is responsible for delivering all of the heavy truck and diesel engine programs engineered in North America. Mr. Balogh has developed a very strong working relationship with his engineering teams, and they rely on his BoM skill sets to manage all aspects of the programs . . . Mr. Balogh is diligent, process oriented and very passionate about his fulfilling his role as senior BoM analyst. Dan accepts new challenges willingly and challenges the other BoM analysts to excel. Dan's always willing to help others, and volunteered to take on additional work load during 2014 . . ."

c. "Dan's leadership and technical expertise have proven very significant in getting PPMs directives and requirements researched, discussed and documented since January 2014 . . ."

d. "Dan is a proven leader (Senior) in the heavy truck arena, offering his experience and expertise in managing and delivering difficult and complex BOMs. In recognition of his achievements, Dan has been recognized on two occasions during 2015 by his engineering . . . teams and once by PPM. Dan continues to set high expectations for his BoMs and the quality of builds."

e. "Dan demonstrates technical excellence, process discipline and holds his teams to high standards on a daily basis. Dan is an extremely valuable member of the PPM engine team, and is an outstanding senior analyst within the PPM Organization."

f. "Dan is on PPMs next up list and is actively pursuing an LL6 opportunity within PPM and/or MP&L to further enhance his career goals/objectives."

g. "Dan's performance as a material control/BoM Senior continues to be performed at high levels. Dan is passionate about his achievements and in delivering quality results for his programs."

h. "He [Dan] had the largest and most complex program in the 7.3L Godzill

    i.   "Mr. Balogh continues to demonstrate his expert knowledge and high expectations for quality with all of his engine programs. Dan is a leader for the prototype engine team, striving to lean and always assisting his team mates whenever he's asked if efforts to make them better."

    j.   "Mr. Balogh continued his role as PPM PTO Prototype Senior during 2020, and carried all of his program(s) work load. Dan is a skilled specialist and provides leadership on a daily basis for both his PD teams and the PPM engine team. Dan consistently makes quality decisions and has high expectations for everything he does."

    k.   "Mr. Balogh continued demonstrating his skill sets and expertise as engine senior BoM specialist in 2021. Dan's previous experiences and knowledge of powertrain prototype processes; working closely with PTO PD engineering and full service suppliers is a strength for our team, department and the Company. Dan competes like a challenger in all he does, and will disrupt inefficient process or status-quo protocols when necessary to delivery high quality BoMs to his teams . . . Dan is a team leader . . ."

388.   At the time of his separation of employment, Balogh was one of eleven GSR8 level employees reporting to Sheets, all of whom were terminated under the SIRP.

389.   Balogh's department was targeted for elimination because it was disproportionately comprised of individuals who were approaching GRP milestones and older employees.

390.   Upon information and belief, Balogh and four or five other GSR8 level employees who reported to Sheets were hired before January 1, 2004, and were therefore pension eligible under the GRP, and were just short of achieving their ERISA-protected Age and Service Milestones.

391.   Balogh and the other ten GSR 8 level employees reporting to Sheets selected for termination ranged from ages 49 to 69.

392.   Following Balogh's termination, he spoke with two LL6s about open positions he qualified for, and that the managers wanted him to fill, but Ford prevented him from seeking those positions because of the SIRP.

393.   After Ford terminated Balogh's employment under the SIRP, it posted open positions and hired new, substantially younger employees into positions that Balogh was better qualified to perform, including, but not limited to:

  a.  Production - Process Coach

  b.  MP&L - Lead Process Coach

  c.  MP&L/Yard Management - Process Coach

  d.  Machining - Manufacturing Supervisor

  e.  KTP - Supplemental Launch Coordinator

  f.  Production Supervisor (8 positions)

  g.  Supplemental Production Supervisor

  h.  Material Planning & Logistics Supervisor

  i.  MP&L - Production Control Supervisor

  j.  KTP - Material Planning & Logistics Supervisor

  k.  Material Control Supervisor

  l.  Production Control Coordinator

394.   In addition to hiring new, younger employees to perform jobs that Balogh was better qualified to perform, Ford also promoted substantially younger and less senior employees to perform jobs that Balogh was better qualified to perform.

395.   Thus, Ford had a continuing need of Balogh's skills and services when it terminated him and Ford retained substantially younger employees in positions that Balogh was better qualified to perform.

396.   Ford did not eliminate Balogh's position or engage in a true reduction-in-force as to his position.

397.   Ford treated similarly situated and substantially younger employees more favorably than Balogh in the process of separating personnel under the SIRP.

398.   Ford replaced Balogh with less experienced and less qualified individuals who were not eligible for or were not approaching the achievement of ERISA-protected Age and Service Milestones.

## PLAINTIFF TODD MUSTAINE[4]

## Disparate Treatment Age Discrimination Claim, Disparate Impact Age Discrimination Claim, and ERISA Discrimination and Interference Claims under 29 U.S.C. § 1140 (Section 510)

399.   Plaintiff Todd Mustaine ("Mustaine"), age 52 at the time of termination, began his employment with Ford on August 23, 1993, and thus had 28.99 years of credited service under the GRP at the time of termination.

400.   Defendant notified Mustaine of his termination on August 22, 2022 and terminated his employment effective August 22, 2022 under the SIRP.

401.   At the time of his termination from employment, Mustaine was nine months away from attaining the 30-year milestone under the GRP.

402.   Mustaine has a Bachelor of Science degree in Industrial Engineering from Ohio University, which he obtained in 1993, and an MBA in finance that he obtained from Wayne State University in 2000.

403.   Throughout his employment with Ford, Mustaine was a consistent and strong performer, receiving achiever ratings in his year-end performance reviews, as well as bonuses, suggestive of the fact that he was a "borderline" top achiever.

---

[4] Prior to filing this lawsuit, Plaintiffs requested their full personnel records from Ford. Ford provided Mustaine's personnel records but omitted his Performance Reviews for the years 2019-2022.

404. Mustaine held a variety of positions throughout his 29.3 years of employment with Ford Motor Company, including considerable time in product development and product planning in powertrain, electronics, and vehicles.

405. Throughout his career at Ford, Mustaine was generally utilized as a portfolio manager and a strategist.

406. At the time of his termination, Mustaine was employed as an Associate Director of Corporate Strategy, an LL5 position.

407. As the Associate Director of Corporate Strategy, Mustaine provided strategic consulting advice to various groups and departments on major strategic projects.

408. At the time of Mustaine's termination, there were approximately 15 individuals, including Mustaine, in similar positions within the Corporate Strategy department.

409. In Corporate Strategy, Mustaine and his fellow employees received, written performance reviews ("PRs") for all individual projects completed during a year. These project-based PRs are in addition to the Company's final year-end PRs.

410. For his final project review of 2020, Mustaine received a rating of 4.9 out of 5.0, as a project leader for a team of LL5 and above stakeholders from throughout the Company.

411.   This review also included positive written comments, thus demonstrating that Mustaine was an excellent performer in Corporate Strategy.

412.   The authors of this PR were Alexandra Ford-English, who is now a member of the Company's Board of Directors, and Kimberly Berry, co-director for the project and current chief of staff to the Company's CEO, Jim Farley.

413.   Following this 2020 individual project PR, Corporate Strategy replaced all three of its strategy directors with substantially younger (all in their 30's or early 40's) and less experienced people one of whom, Matt Smith, had come to Ford from Boston Consulting Group and others who were brought in from outside consulting firms and without Ford experience.

414.   During his time in the Corporate Strategy department, Mustaine observed that the vast majority of those individuals in comparable positions were younger and did not have enough time with the Company to qualify for the Defined Benefit Plan.

415.   At the time of Mustaine's termination, two of the fifteen individuals in his department with comparable positions were let go, i.e., Mustaine and another individual.

416.   Two individuals who were older than Mustaine were retained; however, those individuals upon information and belief had already become fully vested in the Defined Benefit Plan.

417. The other eight individuals that were retained were all younger than Mustaine and, upon information and belief, were not participants in the Company's Defined Benefit Plan.

418. At the time of his termination, Mustaine possessed a very broad breadth of skills, having spent considerable time in powertrain manufacturing, product development, and product planning, and he demonstrated a skill set that was transferrable to many skills and functions that Ford needed for the future.

419. Just prior to his termination, Mustaine interviewed for an LL4 position.

420. Mustaine was not selected for the LL4 position, but was told that he was a strong candidate and would be considered for similar positions in the future, thus demonstrating that Mustaine had the performance, breadth of skills, and correlation to the future needs of the Company.

421. In addition to hiring new, younger employees to perform jobs that Mustaine was better qualified to perform, Ford also promoted substantially younger and less senior employees to perform jobs that he was better qualified to perform.

422. Thus, Ford had a continuing need of Mustaine's skills and services when it terminated his and retained substantially younger employees in positions that Mustaine was better qualified to perform.

423. Ford did not eliminate Mustaine's position or engage in a true reduction-in-force as to his position.

424.    Ford treated similarly situated and substantially younger employees more favorably than Mustaine in the process of separating personnel under the SIRP.

425.    Ford replaced Mustaine with less experienced and less qualified individuals who were not eligible for or were not approaching the achievement of ERISA-protected Age and Service Milestones.

### PLAINTIFF JEAN DRUCKER

**Disparate Treatment Age Discrimination Claim, Disparate Impact Age Discrimination Claim, FMLA Claim, and ERISA Discrimination and Interference Claims under 29 U.S.C. § 1140 (Section 510)**

426.    Plaintiff Jean Drucker ("Drucker"), age 50 at the time of termination, began her career with Ford as an undergraduate student in college in 1992.

427.    On May 1, 1994, Drucker was hired as a Ford Motor Company employee, and she thus had 28.25 years of credited service in the GRP at the time of termination.

428.    Defendant notified Drucker of her termination on August 22, 2022, and terminated Drucker's employment effective August 31, 2022, under the SIRP.

429.    Thus, at the time of her termination from employment, Drucker was 21 months away from her 30-year retirement milestone under the GRP.

430.    Drucker has a Bachelor of Science in Mechanical Engineering from the University of Michigan, a Bachelor of Science in Mathematics from Eastern

Michigan University, as well as a Master of Business Administration from Wayne State University.

431.   Throughout her employment with Ford, Drucker was a consistent and strong performer, receiving Achiever and Top Achiever ratings in her year-end performance reviews.

432.   Drucker held a variety of positions throughout her 28 years of employment with Ford Motor Company, including:

     a.  Quality - Quality/Reliability Engineer, 1994-1997

     b.  Vehicle Engineering - Ranger Integration Engineer, 1997-1999

     c.  Program Management - Ranger PM Engineer, 1999-2001

     d.  Body Engineering - Interior Engineer, 2001-2005

     e.  Body Engineering - Cross Car Beam Engineer, 2005-2012

     f.  Program Management - Mustang PM Analyst, 2012-2017

     g.  Planning - Vehicle Planning Supervisor, 2014-2017

     h.  Planning – Global Cycle Planning Specialist, 2017-2022

433.   At the time of her termination, Drucker held the position of Global Cycle Planning Specialist, salary grade LL6.

434.   In this last position, Drucker reported to Global Cycle Planning Manager John Amann ("Amann"), salary grade LL5, who, in turn, reported to Brian Amidon, Sustainability Strategy and Planning Manager, salary grade LL4.

435. Drucker's skill set was very broad and was transferrable to many skills and functions that Ford needed for the future.

436. Drucker's annual performance reviews consistently contain praise from supervisors regarding her expertise, efficiency, leadership, and excellent performance, including but not limited to the following:

    a.  "Jean Drucker was an invaluable resource to the S550 Program Team and S550 Launch Team. She was involved in all aspects of launch from supporting on--line builds, control plan process, issues resolution, management reviews and program readiness reviews. Jean led change control for S550 and did a tremendous job in managing the large amount of concerns while containing all build events with the latest product improvement actions."

    b.  "Jean has a good knowledge of the business and shows strong future capability."

    c.  "The speed with which we have to develop and release data, I appreciate the process discipline Jean brings to the group. It elevates the group quality I think. Jean is always open to rethinking process in order to make them better."

    d.  "Jean was a key contributor to core workstreams in Global Cycle Planning throughout 2019. She led the overall coordination and delivery of Global Co-Location at 2019A and 2019B Cycle Plan. This is a critical event to bring together all Regions for collaboration and publication of the Global Cartoon. Jean's leadership brought structure and discipline to ensure a robust Co-Location process. Jean also led the Cycle Plan team to ensure metadata was ready to feed SPCPS and worked with the volumes team to ensure all CP data supports FPVs. This was especially at 19B due to the very tight time window to feed CP data to the FPV team. Jean led the team to ensure it was delivered on-time and with quality. Jean also led delivery of key CP Metrics . . . She was also instrumental in creating a new AAoP Eng.% Revenue metric . . . which will provide insights on Engineering efficiency as it relates to AAoP and Revenue."

94

e. "2020 was a challenging year due to the pandemic and demand on the automotive business. Jean played a key role on the Global Cycle Planning team to help overcome the obstacles and deliver throughout the year. The biggest example for Jean was during Global Co-Location. Traditionally, leads from all key Regions travel to a single location to collaborate and deliver the Global Product Cartoon. Due to the pandemic, the teams could not travel for 20B Cycle Plan. Jean developed the plan to enable a first-time 100% 'Co-Location' event . . . which led to a successful 'Co-Location' event."

f. "Jean continued to lead the cartoon development and co-location process into 2021. Despite the on-going challenges and restrictions presented by the pandemic, she has been able to successfully pivot to doing virtual co-location events and make them highly efficient. She has also consistently published the cartoons on time with quality, demonstrating a resilience that is Built Ford Tough."

437.   In the spring of 2022, Drucker's entire Global Planning group was told by their LL2 Executive Director, Todd Hoevener, that the group was safe from layoffs, and that the Global Planning Group was in fact expanding.

438.   Just before Drucker's termination of employment, she informed Amann that she may be taking a short leave of absence under the Family Medical Leave Act ("FMLA") because her father was dying.

439.   At the time of Drucker's termination of employment, she was in the process of finalizing plans with Program Management Supervisor Tim Farmer, salary grade LL5, to transfer back to Program Management to work on the next generation F150.

440.   Drucker's impending transfer to Program Management was confirmed by the Director of Program Management, Dave Pericak, salary grade LL2, who expressed to Drucker his surprise at the news of her termination.

441.   At the time of her separation of employment, Drucker was one of four LL6 level employees reporting to Amann, but the only one who was terminated under the SIRP.

442.   Of the four LL6 level employees who reported to Amann, Drucker was the only one eligible for pension benefits under the GRP.

443.   After being notified of her selection for separation, Drucker reached out to several contacts within Ford, including former supervisors and co-workers, to see if she could find an open position and continue her employment with the Company.

444.   Meghan Shinska ("Shinska"), Launch Manager in Vehicle Operations, informed Drucker that she would be a perfect fit for a job in Manufacturing, but that she was prohibited from offering the job to Drucker, despite her qualifications, because of the SIRP.

445.   Shinska also told Drucker that there were process engineering openings, but they were told that they weren't allowed to take on any employees who were separated under the SIRP to fill those open positions, even though the positions were being posted online as open positions with Ford.

446.    Drucker was further informed that even Executive Directors (LL2 level employees) could not hire anyone who was on the list of separated employees, even if they were best qualified for positions they needed to fill, and that only the Company's CEO, Jim Farley, could approve the placement of a separated employee into an open position at Ford.

447.    Drucker was informed that even if there were open positions for which she was qualified, "the system was locked" from considering employees who had been separated under the SIRP.

448.    After Ford terminated Drucker's employment under the SIRP, it posted open positions and hired new, substantially younger employees into positions that Drucker was better qualified to perform, including, but not limited to:

    a.   Tool and Die - Process Coach

    b.   TVM - Engineer (2 positions)

    c.   Material Flow - Engineer

    d.   Ford Pro - Charging Inventory Analyst

    e.   Product Design - Engineer

    f.   Steel and Aluminum - Procurement Specialist

    g.   Human Factors and Optics Core Supervisor

    h.   Lighting Engineer (2 positions)

    i.   Electrical Component Engineer

j.  Human Factors Core Supervisor

k.  Prototype Planner

l.  Quality - Team Manager

m. Product Development Engineer (11 positions)

n.  Theme Development Engineer

o.  Program Control Engineer (3 positions)

p.  MP&L - Process Coach

q.  Surface Development Design Quality

r.  Quality/Process - Team Manager

s.  ADAS Quality Engineer

t.  Truck Product Marketing Manager

u.  ADAS Warranty Engineer

v.  Product Development - Seat Structure Engineer

w. Manufacturing Engineer

x.  Ford Pro Charging - Business Analyst

y.  Project Management Analyst/Build Coordinator

z.  Senior Production Supervisor Quality

aa. Ford Pro EV Truck Product Marketing Manager

bb. Manufacturing - Engineering Specialist

cc. Fuel Economy and Performance Engineer

dd. Strategy Manager

ee. Quality Process Engineer

ff. Chassis Brakes Engineer

gg. Quality - Engineering Specialist

hh. New Model Programs Activity - Launch Engineer (2 positions)

ii. Program Planning Analyst

jj. Electrification - Business Launch and Operations Manager

kk. Ford Pro - Business & Process Analyst

ll. Production Supervisor

mm.     Product Development Coordinator (2 positions)

nn. Production - Process Coach

oo. Auditor

pp. Product Development Analyst

qq. Program Management Analyst

449.   In addition to hiring new, younger employees to perform jobs that Drucker was better qualified to perform, Ford also promoted substantially younger and less senior employees to perform jobs that Drucker was better qualified to perform.

450. Thus, Ford had a continuing need of Drucker's skills and services when it terminated her and retained substantially younger employees in positions that Drucker was better qualified to perform.

451. Ford did not eliminate Drucker's position or engage in a true reduction-in-force as to her position

452. Ford treated similarly situated and substantially younger employees more favorably than Drucker in the process of separating personnel under the SIRP.

453. Ford replaced Drucker with less experienced and less qualified individuals who were not eligible for or were not approaching the achievement of ERISA-protected Age and Service Milestones.

454. Ford targeted Drucker for termination because of her age, and with the specific intention of interfering with her attainment of pension benefits, and because of her potential need for impending leave under the FMLA.

## PLAINTIFF JILL MAISANO

### Disparate Treatment Age Discrimination Claim, Disparate Impact Age Discrimination Claim, and ERISA Discrimination and Interference Claims under 29 U.S.C. § 1140 (Section 510)

455. Plaintiff Jill Maisano ("Maisano"), age 54 at the time of termination, began her career with Ford as an independent contractor in 1988.

456.   On July 1, 1996, Maisano was hired as a Ford Motor Company employee, and she thus had 26.08 years of credited service in the GRP at the time of termination.

457.   Defendant notified Maisano of her termination on August 22, 2022, and terminated Maisano's employment effective August 31, 2022, under the SIRP.

458.   Thus, at the time of her termination from employment, Maisano was 5 months and nine days away from her normal early retirement (55 and 10) milestone under the GRP and was 3 years and 10 months away from her 30-year retirement milestone under the GRP.

459.   Maisano has a Bachelor of Arts degree in Advertising from Michigan State University as well as a Master of Arts degree in Advertising from Michigan State University.

460.   Throughout her employment with Ford, Maisano was a consistent and outstanding performer, receiving Achiever and Top Achiever ratings in her year-end performance reviews, as well as being rewarded additional compensation in her bonuses and merit raises in recognition of her outstanding performance over the years.

461.   Maisano also received several awards from within her PPM department, and well as from Engineering, for her "superior performance" and for going above-and-beyond in assisting her coworkers and customers.

462.    Maisano held a variety of positions throughout her 26 years of employment with Ford Motor Company, including:

    a.  Experimental Parts Analyst, 1988-1996

    b.  Production Bill of Materials Analyst, 1996-2008

    c.  Calibration Project Manager Analyst, 2008-2012

    d.  Prototype Bill of Materials Analyst, 2012-2022

463.    At the time of her termination, Maisano held the position of Prototype Bill of Materials Analyst, salary grade GSR8, within the Pre-Production Management Department.

464.    In this last position, Maisano reported to Power Train Prototype Supervisor David Sheets ("Sheets"), salary grade LL6.

465.    Sheets reported to Pre-Production Management Department Manager Mike Paskus, salary grade LL5, who, in turn, reported to Todd Bryant, Director of Material Planning and Logistics, salary grade LL3.

466.    Maisano's skill set is very broad and was transferrable to many skills and functions that Ford needed for the future including production plant operations, supply chain, engineering, product development, and marketing. For example:

    a.  Maisano had plant experience and, as a contract employee, she handled logistics responsibilities as a parts expediter at the Pilot Plant (now known as NMPDC), as well as responsibilities for scheduling/process engineering changes at Chesterfield Trim Plant (now Visteon).

b. As a Project Management Analyst, she demonstrated broad skills that could be useful in many other departments at Ford, including working in Work Planning, which was shifted from PPM to Engineering.

c. With degrees and experience in advertising, Maisano had skills that were transferrable and useful in Ford's marketing, sales, and service departments.

467. Maisano's annual performance reviews consistently contain praise from supervisors regarding her expertise, efficiency, leadership, and excellent performance, including but not limited to the following:

a. "Jill is successfully launching the 6F-15 Transmission for the B479 and B515 Programs. Jill has successfully managed major obstacles to ensure success . . .Jill received compliments for her efforts from many members of the 6F15 team."

b. "Jill delivered the 6F15 events with 100% accuracy..She maintains a good demeanor when working with colleagues from different cultures (China, Brazil & Europe). Jill is a good team player…She goes beyond our team to resolve issues."

c. "Jill has successfully delivered the 8F57 X0 and M1 builds, and also 6F15 M1 builds."

d. "She also problem-solved release issues for co-workers and assisted them with work load issues."

e. Jill "distinguished herself by taking the lead in the following areas . . ."

f. "Jill saved Ford $165,329 on 6 occasions when she helped ATNPC find lost parts, preventing ordering replacements. She saved Ford $9376 on 6R100, when she prevented releases from going out on 8 canceled units."

g. "Ms. Maisano was very effective in managing her programs in 2019. Jill sets high expectations for herself and her teams and does the right thing."

h. "Jill saved Ford $48,000 through catching BOM / OCP errors, investigating & refuting false shortage claims & reducing extraneous orders . . . All her Builds finished ahead of schedule due to Jill having all parts early, helping Tracey w/ CRD workload peaks."

i. "Ms. Maisano did a fantastic job managing her programs during a very difficult and challenging year. The pandemic changed the way the teams worked, Jill did a great job WFH with no disruptions in scheduled program builds. Jill is efficient, works well with her group and PD teams, and covers other PPM analysts without hesitation."

j. "Jill saved Ford $19K by challenging BOM direction, catching BOM & 4-wall errors & changing suppliers . . . She found lost parts, prevented double orders, saved $ . . . All her builds finished ahead of schedule due to Jill having all parts early, helping Build Team w/ CRD workload peaks."

k. "Ms. Maisano manages multiple transmission programs supporting [ ] Ford's prototype process at ATNPC Livonia. Jill consistently delivers high quality BoMs and process support on a daily basis to all of her teams. Jill competes like a challenger with PD engineering, suppliers, dock and new build areas. Jill will disrupt outdated process and status-quo protocols if necessary to accelerate and improve process deliverables as required. Jill sets consistently high standards of quality for herself and all of her teams. Further Jill has developed very effective working relationships with her teams during 2021, delivering high quality results during the pandemic."

l. In her 2021 Performance Review, Maisano was commended by another employee because her "support went above & beyond & truly exemplifies the initiative to Go Further for our business & customers!"

468. In February 2019, after receiving a Top Achiever rating in 2017, Maisano was promoted to GSR 8 "[i]n recognition of [her] outstanding contribution to the organization."

469.   At the time of her separation of employment, Maisano was one of eleven GSR8 level employees reporting to Sheets, all of whom were terminated under the SIRP.

470.   Maisano's department was targeted for elimination because it was disproportionately comprised of individuals who were approaching GRP milestones and older employees.

471.   Maisano and 4-5 other GSR8 level employees who reported to Sheets were pension eligible under the GRP, but just short of their respective 30-year retirement milestones.

472.   Maisano and the other ten GSR8 level employees reporting to Sheets ranged from ages 49 to 69.

473.   After Ford terminated Maisano's employment under the SIRP, it posted open positions and hired new, substantially younger employees into positions that Maisano was better qualified to perform, including, but not limited to:

a.   Container Management Analyst

b.   Ford Drive Operations Business Specialist

c.   Global PR Coordinator

d.   Logistics Strategy Analyst

e.   Material Control Supervisor

f.   MP&L Production Control Analyst

g.  MP&L Supervisor

h.  Process Coach (7 positions)

i.  Product Development Coordinator

j.  Production Control Coordinator

k.  Production Supervisor (5 positions)

l.  Purchasing Buyer

m. Project Management Analyst

n.  Project Management Analyst/Build Coordinator

o.  Prototype Planner

p.  Steel and Aluminum Procurement Specialist

474.   In addition to hiring new, younger employees to perform jobs that Maisano was better qualified to perform, Ford also promoted substantially younger and less senior employees to perform jobs that Maisano was better qualified to perform.

475.   Thus, Ford had a continuing need of Maisano's skills and services when it terminated her, and Ford retained substantially younger employees in positions that Maisano was better qualified to perform.

476.   Ford did not eliminate Maisano's position or engage in a true reduction-in-force as to her position.

477.   Ford treated similarly situated and substantially younger employees more favorably than Maisano in the process of separating personnel under the SIRP.

478.   Ford replaced Maisano with less experienced and less qualified individuals who were not eligible for or were not approaching the achievement of ERISA-protected Age and Service Milestones.

## COUNT I
### VIOLATION OF ERISA §510
### ALL PLAINTIFFS V. DEFENDANT FORD MOTOR COMPANY

479.   Plaintiffs incorporate by reference the allegations set forth above as if stated in full herein.

480.   The Employee Retirement Income Security Act, ("ERISA") protects employees who, through their employment, participate in retirement income and health and welfare benefit plans. Because employers control employees' ability to earn retirement benefits through continued employment, Congress made it unlawful, under ERISA, for an employer to make adverse employment decisions motivated by an intention to deprive employees of retirement benefits for which they would become eligible through continued employment.

481.   Congress embedded this policy into Section 510 of ERISA, 29 U.S.C. § 1140, which provides:

> It shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan, this subchapter, section 1201 of this title, or the Welfare and Pension

Plans Disclosure Act, or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan[.] 29 U.S.C. § 1140

482. Plaintiffs are participants in the Ford GRP, which is an ERISA plan as that term is defined in ERISA.

483. The Ford GRP is an ERISA Plan subject to §510 of the Employee Retirement Income Security Act ("ERISA"). 29 U.S.C. §1140.

484. The prohibitions of § 510 are aimed primarily at preserving the integrity of pension promises and obligations by preventing employers from discharging or harassing their employees to keep them from obtaining vested pension rights.

485. By its terms, § 510 protects plan participants from termination motivated by an employer's desire to prevent a pension from vesting. However, the protections of § 510 are not limited to vested pension rights. The Sixth Circuit has clarified that § 510 prohibits interference with rights to which an employee 'may become entitled' under 'an employee benefit plan' and does not limit its application to benefits that will become vested.

486. Unlawful interference under Section 510 includes terminating an employee to interfere with the employee's ability to receive future benefits under an ERISA plan. In this way, ERISA Section 510 is designed to protect the employment relationship which gives rise to an individual's pension rights.

487.   In this case, Ford intentionally terminated Plaintiffs' employment pursuant to the SIRP for the specific purpose of interfering with their ability to receive identifiable ERISA Plan benefits, specifically (1) "55 and 10" early retirement benefits under the GRP; and (2) "30 and Out" supplemental benefits" under the GRP.

488.   In selecting employees for termination under the SIRP, Ford utilized specific employment practices that it designed and implemented with the specific intention to target employees for termination based on proximity to age or service milestones for GRP benefits, and to target employees for termination based on their date of hire prior to January 1, 2004, who, by virtue of their hire date, would have reached ERISA Age and Service milestones for specific GRP pension benefits,

489.   There is evidence that Ford was concerned about high GRP legacy costs attributable to older employees, such as Plaintiffs, who were close to attaining full GRP benefits in the form of "55 and 10" or 30-year retirement benefits.

490.   Both internally and publicly, Ford has expressed its concerns about increasing pension liabilities in the form of pension benefits that would be payable to aging employees, including Plaintiffs, who were approaching but still short of their "55 and 10" early retirement benefits and "30 and out" supplemental pension benefits.

491. The highest members of Ford Senior management have expressed the intention and gave directives to terminate employees in the SIRP process if they were hired before January 1, 2004.

492. Ford's specific intention to interfere with GRP benefits was a motivating factor in its decision to terminate Plaintiffs' employment in the SIRP.

493. Plaintiffs were all approaching vesting in full GRP benefits, and in addition to Ford's concerted plan and effort to target them for termination to prevent attainment of pension benefits, this proximity to vesting provides an inference of intentional, prohibited interference in violation of ERISA Section 510.

494. Plaintiffs have standing to bring this Section 510 claim against Ford because they are former employees of Ford who are or may become eligible to receive a benefit from the GRP, an employee benefit plan, and each Plaintiff is therefore a "participant" in the GRP.

495. Exhaustion of administrative remedies under the GRP is not required as a pre-condition to filing the ERISA claims in this action, as a matter of law, and because no such remedies are available to resolve any of the issues raised in this complaint and, if any such remedies were available, pursuing them would be futile.

496. Neither Ford Motor Company nor the Plan Administrator of the GRP offers salaried employees such as Plaintiffs an administrative appeal process to challenge their "discharge…for the purpose of interfering with the attainment of"

110

their GRP pension benefits, as prohibited by Section 510 of ERISA, 29 U.S.C. §1140.

497. The lack of available administrative remedies is demonstrated by information provided to Plaintiff Carron Odokara by Ford HR representative Chris Basmadjian, who informed Odokara via email that there was "no provision available to extend the timing of your separation as requested, nor does the GRP include a provision to allow you to pay for time to qualify for retirement. These separation decisions were reviewed at multiple levels and are final."

498. As a result of Ford's violation of Section 510 of ERISA, 29 U.S.C. §1140, Plaintiffs have suffered and will continue to suffer losses and damages in the form of lost salary and benefits, including GRP benefits.

499. Accordingly, to redress the violations of ERISA §510 alleged in this action, Plaintiffs request the following relief from this Court:

    a. A declaration that the GRP is an ERISA plan;

    b. A declaration that Ford violated Plaintiffs' rights under §510 of ERISA when it terminated Plaintiffs employment in order to interfere with their ability to receive future benefits under the GRP;

    c. An equitable order of reinstatement to each Plaintiff's prior position or to comparable positions of employment with Ford, or an equitable order of front pay in lieu of reinstatement;

    d. An order of equitable relief awarding GRP benefits, or other monetary compensation, in order to make Plaintiffs whole;

     e.  An order of any other equitable and/or legal relief the court deems necessary to enforce Plaintiffs' rights under ERISA;

     f.  An award of attorneys' fees and costs.

**COUNT II**
**VIOLATION OF ELCRA**
**AGE DISCRIMINATION- DISPARATE TREATMENT**
**ALL PLAINTIFFS V. DEFENDANT FORD MOTOR COMPANY**

500.   Plaintiffs incorporate by reference all the allegations contained above, as though stated in full herein.

501.   At all times relevant to this action, Defendant Ford was an employer within the meaning of the ELCRA. MCL §37.2201(a).

502.   Under the ELCRA, Ford is prohibited from limiting, segregating, or classifying an employee in a way that deprives or tends to deprive the employee of an employment opportunity because of the individual's age, or to otherwise discriminate against an individual with respect to employment, compensation or a term, condition, or privilege of employment, because of the individual's age.

503.   In violation of the statutory duties set forth in the ELCRA, Ford designed and implemented the SIRP for the purpose of targeting for termination older employees, including Plaintiffs, so that it could promote younger employees into positions held by older and more senior personnel.

112

504. As to Plaintiff's disparate treatment claim, each Plaintiff has pleaded facts, set forth above, showing that Ford selected them for separation based on their age.

505. Plaintiffs were selected for termination because of age, as demonstrated in part by the fact that Ford retained significantly younger employees in positions that Plaintiffs were better qualified to perform, Ford treated younger employees more favorably than Plaintiffs in the process of deciding which employees would be selected for separation, and Ford posted for and hired new, substantially younger employees into Plaintiffs' former positions, or into positions which Plaintiffs were better qualified to perform.

506. Furthermore, adverse employment actions taken because of age are unlawful regardless of whether they are based on explicit and conscious age bias, or on implicit and unconscious age bias.

507. Ford has a duty as an employer to refrain from discrimination based on age, including taking steps to ensure that the process of selecting employees for separation in the organizational restructuring action/reduction-in-force was not influenced by conscious age bias, or by implicit and unconscious age bias.

508. Ford encouraged the influence of conscious and unconscious age bias in the selection process because it knew that its selection practices were empirically

known to discriminate, and because it knew that its selection processes lacked structured, objective criteria and were prone to discrimination.

509.   Ford's leadership, including CEO Farley, signaled to decision-makers that it was okay to rely upon conscious and unconscious age bias and ageist stereotypes in selecting employees for termination.

510.   The SIRP criteria themselves are purely subjective and are infused with age bias for the reasons set out in this Complaint.

511.   As a direct result of these unlawful employment practices, Plaintiffs have and will continue to experience economic losses in salary, incentive compensation and bonuses, fringe benefits, promotional opportunities, and a loss of earning capacity caused by the stigma of being terminated from their positions with Ford.

512.   As a direct result of these unlawful employment practices, Plaintiffs have and will continue to experience non-economic losses including loss of reputation, humiliation, embarrassment, mental anguish and emotional distress.

513.   Accordingly, Plaintiffs request the following relief from this Court:

  a. An order of this Court declaring that Ford violated ELCRA's prohibition against age discrimination when it terminated Plaintiffs' employment;

  b. An order of this Court awarding Plaintiffs all economic losses, lost wages and benefits, and other forms of compensation, economic and non-economic damages, past and future, resulting from the discriminatory treatment described in this Complaint;

c. An order of this Court reinstating Plaintiffs to employment with Ford in positions comparable to those which they held at the time they were terminated;

d. An order of this Court awarding interest, costs and attorney fees; and

e. An order of this Court awarding such other relief as this Court deems just and equitable.

f.

## COUNT III
## VIOLATION OF THE ELLIOTT-LARSEN CIVIL RIGHTS ACT
## DISPARATE IMPACT – AGE DISCRIMINATION
### PLAINTIFFS JENSEN, KARFIS, MUSTAINE, WEGRYN, DRUCKER, CHAVA, GILMOUR, VILLANUEVA, MAISANO, MERIDETH, ODOKARA, PENN, REICHENBACH AND SCHULTZ V. DEFENDANT FORD MOTOR COMPANY

514. Plaintiffs incorporate by reference all the allegations contained above.

515. Ford's implementation of the organizational restructuring action/reduction-in-force under the SIRP reduction-in force program and the use of the mechanisms, means, processes and criteria to select which employees would be separated, while purportedly designed to be "neutral," violates the ELCRA's prohibition against age discrimination in that its application had a disparate impact on the Company's salaried employees age 50 and older who were considered for separation using the Company's SIRP selection criteria and the related methods, means, criteria, and processes for selecting which employees would be selected for separation.

516.  The mechanisms, means, processes, and criteria used by Ford in the course of implementing the organizational restructuring action/reduction-in-force were the cause of the selection disparities based on age.

517.  Plaintiffs challenge the specific mechanisms, means, criteria, and practices by which Ford selected employees for termination in the course of implementing its organizational restructuring action/reduction-in-force, which caused significant statistical disparities based on age, including the following employment practices:

a.  Designing and programming its reduction-in-force/organizational restructuring process to target older and higher pension-cost salaried employees based on legally protected characteristics including the employee's proximity to retirement benefit milestones or the employee's age.

b.  Targeting demographically disproportionate departments for separations, thus increasing the likelihood of selecting employees over the age of 50.

c.  Defendant's use of the stated SIRP criteria, including: " the employee's performance; the employee's skill level and breadth of skills; and the correlation between the employee's skill level and breadth of skill and

the work that is necessary for the Company to perform to achieve its objectives."

d. Defendant's practice of allowing decision makers to make putatively individualized, discretionary and subjective choices of which jobs to eliminate and/or which employees to select for separation.

e. Placing the decision-making process in the hands of multiple decision makers without uniform criteria or standardized guidance when making those decisions.

f. Traditionally, Ford has used forced ranking performance evaluation processes and other ranking and rating methods that are biased against its older employees, and, upon information and belief, Ford used those same or similar forced ranking and other ranking and rating methods in the course of implementing the 2022 SIRP reduction-in-force.

518. These particular employment practices by which Ford carried out its reduction-in-force had a disparate impact based on age in violation of ELCRA.

519. The age disparity caused by the practices used by Ford to implement the organizational restructuring action/reduction-in-force cannot be justified as necessary to Ford's business.

520. Regardless of Ford's stated reasons for implementing the organizational restructuring/reduction-in-force (cost savings, modernizing or

refining the workforce, or other), the practices by which Ford carried out the RIF, which Plaintiffs challenge in this case, are not themselves defensible as a business necessity, in part because Ford could have achieved its overall objectives without utilizing the practices which caused an unlawful disparity based on age.

521.   As a direct result of the disparate impact because of age, Plaintiffs have suffered an adverse employment action, in the form of their contemporaneous terminations from employment, and will continue to suffer, all of the injuries and damages as set forth above.

522.   Accordingly, Plaintiffs request the following relief from this Court:

a. An order of this Court declaring that the SIRP reduction-in-force program utilized by Ford to select individuals for layoff violates the ELCRA and enjoining the further application of those policies and practices;

b. An order of this Court awarding Plaintiffs all economic losses, lost wages and benefits, and other forms of compensation, economic and non-economic damages, past and future, resulting from the discriminatory treatment described in this Complaint;

c. An order of this Court reinstating Plaintiffs to employment with Ford in positions comparable to those which they held at the time they were terminated;

d. An order of this Court awarding interest, costs and attorney fees; and

e. An order of this Court awarding such other relief as this Court deems just and equitable.

## COUNT IV
## VIOLATION OF THE ELLIOTT-LARSEN CIVIL RIGHTS ACT
## SEX DISCRIMINATION

### PLAINTIFFS CHAVA, WEGRYN, AND MERIDETH V. FORD MOTOR COMPANY

523.   Plaintiffs incorporate by reference all the allegations contained above.

524.   Michigan's Elliott-Larsen Civil Rights Act, MCL 37.2101 *et seq.*, prohibits workplace discrimination because of an employee's sex.

525.   At all relevant times, Plaintiffs were employees of Defendant Ford.

526.   At all relevant times, Defendant Ford was an employer covered by and subject to the ELCRA.

527.   Defendant selected Plaintiffs Chava, Wegryn, and Merideth for separation because of their sex, as alleged above, and as demonstrated by the fact that Ford replaced Plaintiffs with less qualified men, and by the fact that Ford treated similarly situated men more favorably than Plaintiffs in the process of selecting which employees would be separated.

528.   The reasons offered by Ford for why it selected Chava, Wegryn, and Meredith were demonstrably false, as demonstrated by the fact that these Plaintiffs demonstrated the performance, breadth of skills, and correlation of skills to the Company's future needs, and therefore the reasons offered by Ford are merely a pretext for sex discrimination.

529.   As a direct and proximate result of Ford's unlawful discrimination,

119

Plaintiffs have suffered and will continue to suffer lost wages and benefits, and other economic advantages of employment, both past and future.

530.   As a direct and proximate result of Ford's unlawful discrimination Plaintiffs have suffered and will continue to suffer mental anguish, humiliation, physical injury, embarrassment, and emotional distress resulting from the discriminatory conduct of Ford.

531.   Accordingly, Plaintiffs request the following relief:

    a.   The Court should order Plaintiffs reinstated to their prior position, or award front pay in lieu of reinstatement;

    b.   The Court should award Plaintiffs compensation for economic and non-economic losses;

    c.   The Court should award Plaintiffs actual attorney fees and litigation costs as provided for in the ELCRA;

    d.   The Court should award Plaintiffs such other relief as the Court determines to be fair and just.

**COUNT V**
**VIOLATION OF THE ELLIOTT-LARSEN CIVIL RIGHTS ACT**
**RACE/ETHNICITY/NATIONAL ORIGIN DISCRIMINATION**
**PLAINTIFF CHAVA VS. DEFENDANT FORD MOTOR COMPANY**

532.   Plaintiffs incorporate by reference all the allegations contained above.

533.   At all times relevant to this action, Defendant Ford was prohibited under the ELCRA from making any employment decisions regarding Plaintiffs which were motivated by race, ethnicity, and/or national origin.

534.   In violation of this duty, Ford terminated Plaintiff Jyothi Chava's

employment because of her race, ethnicity, and/or national origin.

535.   As alleged above, Chava, who is Indian-American, and the only other Indian-American woman reporting to Buiteweg, were selected for separation, while Ford retained and did not separate the four Caucasian men at the LL5 level reporting to Buiteweg.

536.   Further, as alleged above, the reasons provided by Ford for why it selected Chava for separation, while retaining similarly situated and less qualified Caucasian men, were merely a pretext for selecting Chava because of her race, ethnicity, and/or national origin.

537.   As a direct and proximate result of Ford's unlawful discrimination, Chava has suffered and will continue to suffer lost wages, benefits, and other economic advantages of employment, past and future.

538.   As a direct and proximate result of Ford's unlawful discrimination Chava has and will continue to suffer mental anguish, humiliation, physical injury, embarrassment, and emotional distress resulting from the discriminatory conduct of Ford.

539.   Accordingly, Plaintiff Jyothi Chava requests the following relief:

   a.   The Court should order Plaintiff reinstated to her prior position, or award front pay in lieu of reinstatement;

   b.   The Court should award Plaintiff compensation for economic and non-economic losses;

    c.   The Court should award Plaintiff actual attorney fees and litigation costs as provided for in the ELCRA;

    d.   The Court should award Plaintiff such other relief as the court determines to be fair and just.

**COUNT VI**
**VIOLATION OF THE FAMILY AND MEDICAL LEAVE ACT**
**PLAINTIFFS SCHULTZ AND DRUCKER VS. DEFENDANT FORD MOTOR COMPANY**

540.   Plaintiffs incorporate by reference all the allegations contained above.

541.   At all times relevant hereto, Plaintiffs Schultz and Drucker were employees and Defendant an employer within the meaning of the Family and Medical Leave Act ("FMLA"), 29 U.S.C. §2601, et seq.

542.   Plaintiff Schultz suffered from a serious health condition in that she had a physical condition that required continuing treatment from a healthcare provider and thus fell within the protection of the FMLA as a person with a serious health condition. 29 U.S.C. §2612(a)(1)(D).

543.   Plaintiff Drucker fell within the protection of the FMLA as a person eligible for leave to care for a parent who has a serious health condition. 29 U.S.C. §2612(a)(1)(C).

544.   Under the FMLA, Defendant had an obligation to inform Plaintiffs of their rights under the FMLA.

545.   Under the FMLA, Defendant had an obligation to provide Plaintiffs with up to 12 weeks of continuous or intermittent leave for a serious health condition

which rendered Plaintiff Schultz unable to perform the functions of her position, and in order to for Plaintiff Drucker to care for a parent who has a serious health condition.

546.   In addition, Defendant is prohibited under the FMLA from retaliating against Plaintiffs for requesting and/or taking FMLA leave.

547.   Notwithstanding Defendant's duties as set forth above, Defendant willfully violated the FMLA by terminating Plaintiff Schultz's employment for requesting and/or taking FMLA leave.

548.   Notwithstanding Defendant's duties as set forth above, Defendant willfully violated the FMLA by terminating Plaintiff Drucker's employment for the purpose of of interfering with her need for impending leave under the FMLA.

549.   As a direct and approximate result of Defendant's violations of the FMLA, Plaintiffs have and will continue to be deprived of wage loss, fringe benefits, status, seniority, and other advantages of employment; Plaintiffs have, and in the future, will experience mental anguish, humiliation, and embarrassment, resulting from Defendant's violations of the FMLA.

550.   Accordingly, Plaintiffs request the following relief:

a.   An order reinstating Plaintiffs to their former positions or comparable positions;

b.   An Order of this Court awarding Plaintiffs liquidated damages in accordance with the FMLA;

c.    An Order of this Court awarding Plaintiffs compensatory damages in
an amount in excess of $75,000.00 she is found to be entitled to;

d.    An Order of this Court awarding Plaintiffs interest, costs, and attorney
fees;

e.    An Order of this Court awarding Plaintiffs such other equitable relief
as this Court deems just and equitable.

Respectfully submitted,

Pitt, McGehee, Palmer,
Bonanni & Rivers PC

By:  s/ Kevin M. Carlson
Kevin M. Carlson (P67704)
Channing E. Robinson-Holmes (P81698)
Megan A. Bonanni (P52079)
Robert W. Palmer (P31704)
Michael L. Pitt (P24429)
Beth M. Rivers (P33614)
Attorneys for Plaintiffs
117 W. Fourth Street, Suite 200
Royal Oak, Michigan 48067
(248) 398-9800
mpitt@pittlawpc.com
brivers@pittlawpc.com
mbonanni@pittlawpc.com
rpalmer@pittlawpc.com
kcarlson@pittlawpc.com
crobinson@pittlawpc.com

Date:  March 14, 2023

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

| | |
|---|---|
| JOHN JENSEN, ANN KARFIS, TODD MUSTAINE, NANCY WEGRYN, JEAN DRUCKER, JYOTHI CHAVA, ELIZABETH GILMOUR, DANIEL BALOGH, TISHA VILLANUEVA, JILL MAISANO, JENNIFER MERIDETH, CARRON ODOKARA, GREG PENN, MICHELE REICHENBACH, DANA TROMBAT, and BRENDA SCHULTZ, | Case No.<br><br>Hon.<br>United States District Judge<br><br>Hon.<br>United States Magistrate Judge |

Plaintiffs,

v.

FORD MOTOR COMPANY, a Delaware
Corporation,

Defendant.

PITT, MCGEHEE, PALMER, BONANNI & RIVERS P.C.
Megan A. Bonanni (P52079)
Kevin M. Carlson (P67704)
Robert W. Palmer (P31704)
Michael L. Pitt (P24429)
Beth M. Rivers (P33614)
Channing E. Robinson-Holmes (P81698)
Attorneys for Plaintiffs
117 W. Fourth Street, Suite 200
Royal Oak, Michigan 48067
(248) 398-9800
mpitt@pittlawpc.com
brivers@pittlawpc.com
mbonanni@pittlawpc.com
rpalmer@pittlawpc.com
kcarlson@pittlawpc.com
crobinson@pittlawpc.com

## DEMAND FOR JURY TRIAL

125

Plaintiffs demand a trial by jury as to all issues raised in this action.

Respectfully submitted,

Pitt, McGehee, Palmer,
Bonanni & Rivers PC

By:  s/ Kevin M. Carlson
     Kevin M. Carlson (P67704)
     Channing E. Robinson-Holmes (P81698)
     Megan A. Bonanni (P52079)
     Robert W. Palmer (P31704)
     Michael L. Pitt (P24429)
     Beth M. Rivers (P33614)
     Attorneys for Plaintiffs
     117 W. Fourth Street, Suite 200
     Royal Oak, Michigan 48067
     (248) 398-9800
     mpitt@pittlawpc.com
     brivers@pittlawpc.com
     mbonanni@pittlawpc.com
     rpalmer@pittlawpc.com
     kcarlson@pittlawpc.com
     crobinson@pittlawpc.com

Dated: March 14, 2023